63 F.3d 1305
 64 USLW 2152, 32 Fed.R.Serv.3d 781,
23 Media L. Rep. 2357
 ANHEUSER-BUSCH, INCORPORATED, Plaintiff-Appellant,
v.
Kurt L. SCHMOKE, in his official capacity as Mayor of
Baltimore City; Mayor and City Council of Baltimore City;
City Council of Baltimore City; David Tanner, in his
official capacity as the General Superintendent of Zoning
Administration and Enforcement, Defendants-Appellees,
and
John Joseph Curran, Attorney General of the State of
Maryland, in his official capacity, Defendant.
The Association of National Advertisers, Incorporated; the
American Association of Advertising Agencies; the Media
Institute; National Association of Broadcasters; the
Thomas Jefferson Center for the Protection of Free
Expression; Washington Legal Foundation; Center for
Science in the Public Interest; Coalition for Beautiful
Neighborhoods; Baltimore City Wide Liquor Coalition for
Better Laws and Regulations, Amici Curiae.
PENN ADVERTISING OF BALTIMORE, INCORPORATED, Plaintiff-Appellant,
v.
John Joseph CURRAN, Attorney General of the State of
Maryland, in his official capacity, Defendant.
The Association of National Advertisers, Incorporated; the
American Association of Advertising Agencies; the Media
Institute; National Association of Broadcasters; the
Thomas Jefferson Center for the Protection of Free
Expression; Washington Legal Foundation; Center for
Science in the Public Interest; Coalition for Beautiful
Neighborhoods; Baltimore City Wide Liquor Coalition for
Better Laws and Regulations, Amici Curiae.
 Nos. 94-1431, 94-1432.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 6, 1995.
Decided Aug. 31, 1995.
 
 ARGUED: John Joseph Walsh, Cadwalader, Wickersham & Taft, New York City, for appellant. Burton Harry Levin, Assistant Solicitor, Baltimore, MD, for appellees. ON BRIEF: Eric M. Rubin, Walter E. Diercks, Jeffrey Harris, Rubin, Winston, Diercks, Harris & Cooke, Washington, DC, for appellant. Neal M. Janey, City Solicitor, Sandra R. Gutman, Associate Solicitor, Department of Law, Baltimore, MD, for appellees. Richard E. Wiley, Lawrence W. Secrest, III, Daniel E. Troy, Luis de la Torre, Frank Winston, Jr., Wiley, Rein & Fielding, Washington, DC, for amici curiae American Advertising Federation, et al. Mark S. Yurick, Senior Assistant City Solicitor, Office of The City Solicitor, Cincinnati, OH, for amicus curiae City of Cincinnati. Daniel J. Popeo, David A. Price, Washington Legal Foundation, Washington, DC, for amicus curiae Washington Legal Foundation. Donald Garner, Professor of Law, Southern Illinois University, Carbondale, IL; The Maryland Congress of Parents & Teachers, Inc., Baltimore, MD, for amicus curiae Maryland Congress. Christopher J. Fritz, Julie Ellen Squire, Thomas C. Dame, Gallagher, Evelius & Jones, Baltimore, MD, for amici curiae Coalition for Beautiful Neighborhoods, et al. Louise H. Renne, City Attorney, Dannis Aftergut, Chief Assistant City Attorney, Barbara Solomon, Deputy City Attorney, John Cooper, Deputy City Attorney, San Francisco, CA, for amicus curiae San Francisco; Joan Gallo, City Attorney, George Rios, Assistant City Attorney, San Jose, California, for amicus curiae San Jose. George Hacker, Center for Science in the Public Interest, Washington, DC, for amicus curiae Center for Science.
 Before NIEMEYER and HAMILTON, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge HAMILTON and Senior Judge BUTZNER joined.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 We decide in this case whether Ordinance 288 enacted by the Mayor and City Council of Baltimore, Maryland, prohibiting the placement of stationary, outdoor "advertising that advertises alcoholic beverages" in certain areas of the City, violates the First and Fourteenth Amendment protections of commercial speech. The district court concluded, after applying the four-part test for evaluating commercial speech announced in Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), that the ordinance did not violate the Constitution,[1] and we now affirm.
 
 
 2
 * Under Maryland law, it is illegal to sell any alcoholic beverage to, or to obtain any alcoholic beverage for, a person under 21 years of age. It is also illegal for a person under 21 years of age to obtain, possess, or control an alcoholic beverage. Md.Code, Art. 27, Secs. 400-403A. To advance the state's interest in those prohibitions and to promote "the welfare and temperance of minors exposed to advertisements for alcoholic beverages," the Maryland legislature authorized the Mayor and City Council of Baltimore (collectively "Baltimore") to adopt an ordinance restricting the placement of signs that advertise alcoholic beverages in "publicly visible locations," i.e. on "outdoor billboards, sides of buildings, and freestanding signboards." Md.Code, Art. 2B, Sec. 222. The authorization, however, contains 10 limitations which prohibit Baltimore from restricting such advertising on, for example, buses, taxicabs, commercial vehicles used in the transportation of alcoholic beverages, and signs at businesses licensed to sell alcoholic beverages, including professional sports stadiums.
 
 
 3
 In January 1994, Baltimore exercised the authority granted it by the State and enacted Ordinance 288 prohibiting the outdoor advertising of alcoholic beverages in certain locations in Baltimore City.[2] The prohibition in the ordinance is subject to the same 10 exceptions specified in the State's authorizing statute, and it also includes an exception permitting such advertising in certain commercially and industrially zoned areas of the City. By its terms, the ordinance was to become effective February 5, 1994.
 
 
 4
 Before enacting the ordinance, the Baltimore City Council conducted public hearings, receiving testimony and previously conducted studies detailing the adverse effects on minors of alcohol consumption and the correlation between underage drinking and the advertising of alcoholic beverages.[3] While one of the studies, the report of the Governor's Prevention Committee, acknowledged that certain studies advanced by the alcohol beverage and advertising industries showed no correlation between alcohol advertising and underage drinking, it concluded that the overwhelming majority of research studies showed a definite correlation. To combat underage drinking, the Prevention Committee's report recommended, among other things, that communities regulate alcoholic beverage advertising on billboards.
 
 
 5
 In the preamble to the ordinance, the City Council summarized its findings in support of the ordinance. The City Council found, for instance, that the consumption of alcoholic beverages is involved in at least one-half of all the major causes of death among youth and that about one-third of all juvenile males arrested said they had consumed alcohol within the previous 72 hours. In concluding that a connection exists between underage drinking and the widespread advertising of alcoholic beverages, the City Council found that alcoholic beverages are the second most heavily advertised products in America (after cigarettes), and that outdoor billboards are a "unique and distinguishable" medium of advertising which subjects the public to involuntary and unavoidable forms of solicitation. The City Council noted that children are exposed to the advertising of alcoholic beverages "simply by walking to school or playing in their neighborhood" and that children's "attitudes favorable to alcohol are significantly related to their exposure to alcohol advertisements." The City Council pointed to the Prevention Committee's report that the " 'overwhelming majority' of research studies showed a definite correlation between alcohol advertising and underage drinking" and concluded that "[a]n ordinance restricting the placement of advertisements for alcoholic beverages in publicly visible locations within Baltimore City is necessary for the promotion of the welfare and temperance of minors exposed to such advertisements." Attempting to tailor its ban, the City Council allowed advertising of alcoholic beverages in commercial and industrial areas, stating that it was "narrowly focus[ing] its efforts on those advertisements which most directly affect minors where they live, attend school, attend church and engage in recreational activities."
 
 
 6
 On January 14, 1994, several weeks before the ordinance was to become effective, Anheuser-Busch, Inc., filed suit in federal court, facially challenging the constitutionality of the ordinance under the First and Fourteenth Amendments. It also challenged the ordinance as it might be applied to public service messages which Anheuser-Busch typically sponsors. One week later, Penn Advertising of Baltimore, Inc., filed a similar suit.
 
 
 7
 Anheuser-Busch is the nation's largest brewer of beers and malt beverages, producing approximately 15 different brands, including Budweiser, Michelob, and Busch. It advertises in all media, including outdoor billboards and displays. In addition to contending that there is no correlation between alcoholic beverage advertising and underage drinking, Anheuser-Busch asserts that the purpose of its advertising is "to solidify brand loyalty and increase market share by shifting adult beer drinkers from other brands to the advertised brand of beer." In its complaint, Anheuser-Busch alleges that it promotes its brands of beer on dozens of billboards in Baltimore and that on seven it publishes public service messages such as, "Know when to say when" and "Let's stop underage drinking before it starts." These public service messages typically include a corporate or product logo of Anheuser-Busch.
 
 
 8
 Penn Advertising is engaged in the business of placing advertising on outdoor advertising signs located throughout Baltimore. It leases land from private property owners, erects and maintains outdoor sign structures on those locations, and rents these signs to its customers, including Anheuser-Busch.
 
 
 9
 Shortly after commencing these actions, Anheuser-Busch and Penn Advertising filed a motion for a preliminary injunction to enjoin enforcement of Ordinance 288 pending the litigation, and the district court issued a stay of the ordinance's enforcement. The Mayor and City Council of Baltimore filed motions to dismiss the actions under Federal Rule of Civil Procedure 12(b)(6) on the grounds that the ordinance is (1) protected by the Twenty-First Amendment and (2) a proper regulation of commercial speech under the framework established in Central Hudson. Baltimore attached to its motions the legislative history of Ordinance 288, including the transcript of the hearings before the City Council and copies of four studies that were considered by the Council.
 
 
 10
 Following a hearing, the district court issued an opinion upholding the constitutionality of the ordinance. Anheuser-Busch, Inc. v. Mayor and City Council, 855 F.Supp. 811 (D.Md.1994). The court also continued its stay of the ordinance's enforcement pending appeal. Contrary to the parties' entreaties that the district court treat Baltimore's motion only as a 12(b)(6) motion, the court concluded in its opinion that because it considered matters outside of the pleadings, it would treat Baltimore's motion to dismiss as a motion for summary judgment under Rule 56. On the merits, the court found that "a reasonable fit exists between the Ordinance and the City's asserted interests," id. at 820, and that billboards "loom[ ] over children every day while they walk to school, and every time they play in their neighborhood, thus forming an inescapable part of their daily life.... Billboard advertisements thus form a constant impetus to consume the product being advertised, the precise goal of the advertisement." Id. at 822. The court held the ordinance constitutional after concluding that it "directly advances the City's asserted interest in promoting the welfare and temperance of minors" and is "narrowly tailored" to that end. Id. at 818. Having found the ordinance constitutional under the framework set out in Central Hudson, the court did not address Baltimore's argument that the ordinance was protected by the Twenty-First Amendment.
 
 
 11
 On appeal, Anheuser-Busch and Penn Advertising contend that the district court erred by converting Baltimore's motions to dismiss into motions for summary judgment without allowing them a reasonable opportunity to submit all materials pertinent to consideration of a motion for summary judgment. On the merits, they argue that the ordinance is unconstitutional on its face because (1) it does not directly and materially advance the government's interest in promoting temperance of minors and (2) it is not narrowly tailored to serve that purpose.[4] They also argue that, as applied, the ordinance would impermissibly restrict their noncommercial speech.
 
 II
 
 12
 We address first the contention that the district court erred in converting Baltimore's motions to dismiss into motions for summary judgment without first providing the parties an opportunity to conduct discovery and to submit all pertinent materials to the court. Anheuser-Busch and Penn Advertising contend that they had no indication that the district court had converted the motions to dismiss into motions for summary judgment until the court issued its memorandum opinion.
 
 
 13
 Federal Rule of Civil Procedure 12(b) provides in relevant part:
 
 
 14
 If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.
 
 
 15
 (Emphasis added). We have held that a court choosing to treat a motion to dismiss as one for summary judgment errs if it fails to provide the parties with notice and a reasonable opportunity to present their positions under Rule 56. See Gay v. Wall, 761 F.2d 175, 178 (4th Cir.1985); Plante v. Shivar, 540 F.2d 1233, 1235 (4th Cir.1976); Johnson v. RAC Corp., 491 F.2d 510, 513 (4th Cir.1974).
 
 
 16
 In ruling on Baltimore's 12(b)(6) motions, the district court stated, without prior notice to the parties, "Because the Court has considered matters outside of the pleadings, the Court will treat the Motion to Dismiss as a Motion for Summary Judgment under Rule 56." 855 F.Supp. at 812. Apparently the court's facial analysis of the ordinance relied to some extent on the exhibits which Baltimore filed with its motion to dismiss, and the court's as-applied analysis involved consideration of the submissions Anheuser-Busch offered in support of its motion for a preliminary injunction. The exhibits which Baltimore filed in support of its motion to dismiss consisted of a copy of Ordinance 288, a transcript of the hearings before the City Council, and four studies that the City Council considered as support for the ordinance. In support of their motions for a preliminary injunction, Anheuser-Busch and Penn Advertising submitted, among other things, the Brewing Industry Advertising Code, sample billboard advertisements, and studies which refute a correlation between alcoholic beverage advertising and underage drinking.
 
 
 17
 The principal challenge to Ordinance 288, advanced under the last two prongs of Central Hudson, consists of the contention that the ordinance (1) does not directly advance the stated governmental purpose and (2) is not narrowly tailored to accomplish that purpose. These prongs focus on the fit between Baltimore's statutory objective and the means it selected to achieve that objective. On this facial challenge, the City bears the burden not of establishing that at every coordinate the regulation advances a governmental purpose and does no more, but rather that it had an objectively reasonable belief that the means which it selected constituted a reasonable "fit" with the regulation's purpose.
 
 
 18
 If Central Hudson 's test required a perfect fit, then Anheuser-Busch would only have to demonstrate some application of the statute inconsistent with the statute's purpose to render it unconstitutional for all purposes. Moreover, if the test required a perfect fit, Anheuser-Busch would certainly be entitled to complete discovery in order to identify all of the statute's possible applications. However, in response to a facial challenge to a regulation of commercial speech, the burden falls on the government to justify its legislative action, but it does not demand that the government canvass every conceivable situation in which some member of the public may be affected atypically by the statute. And the court's inquiry is limited to consideration of the ordinance on its face against the background of the government's objective and the prospect of the ordinance's general effect. If it appears to the court that the legislative body could reasonably have believed, based on data, studies, history, or common sense, that the legislation would directly advance a substantial governmental interest, the government's burden of justifying it is met. See, e.g., Florida Bar v. Went For It, Inc., --- U.S. ----, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995). As the Supreme Court recently observed in Florida Bar:[W]e have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and "simple common sense."
 
 
 19
 Id. at ---- - ----, 115 S.Ct. at 2377-79 (citations omitted). Cf. Edenfield v. Fane, --- U.S. ----, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) (pointing to facts relevant to consideration of as-applied challenge to commercial speech regulation). In Florida Bar, the Court relied principally on a study conducted by the Florida bar on the effects of lawyer advertising to conclude that the prohibition against lawyer solicitation within 30 days of an accident directly and materially advanced the state's substantial interest of preserving the integrity of the legal profession. Thus, the government's burden of justifying its legislative enactment against a facial challenge may be carried by pointing to the enactment itself and its legislative history. These are "legislative facts," the substance of which cannot be trumped by the fact finding apparatus of a single court. See Dunagin v. City of Oxford, Miss., 718 F.2d 738, 748-49 n. 8 (5th Cir.1983) (en banc), cert. denied, 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984). While a party challenging an ordinance can point to other factors not considered by the legislature to demonstrate that the legislature acted irrationally, it cannot subject legislative findings themselves to judicial review under a clearly erroneous standard or otherwise. To do so would ignore the structural separation between legislative bodies and courts and would improperly subordinate one branch to the other. The court's role in reviewing the constitutionality of a legislative enactment is more fundamental; it is limited to addressing whether the legislative enactment conflicts with the Constitution. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).
 
 
 20
 By force of the same reasoning, if a plaintiff challenges a legislative enactment as applied to an actual circumstance, then the court is given the task of finding the facts defining that circumstance and determining how the circumstance is impacted by the legislative enactment. See Edenfield, --- U.S. at ---- - ----, 113 S.Ct. at 1800-01.
 
 
 21
 In this case, the district court properly looked to the legislative history of Ordinance 288 to determine that Baltimore had met its burden under Central Hudson. Having found the burden met, the court was not required on a facial challenge to look further with a more specific inquiry into the ordinance's impact on Anheuser-Busch and Penn Advertising, nor did it. It was unnecessary for the court to have concluded that, because it looked beyond the pleadings to the transcript and four studies constituting the legislative history, it had to consider the case under Rule 56. For purposes of Rule 12(b)(6), the legislative history of an ordinance is not a matter beyond the pleadings but is an adjunct to the ordinance which may be considered by the court as a matter of law. See generally 5A Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure Sec. 1357 (1990) (in deciding Rule 12(b)(6) motions, courts may consider matters of public record, items appearing in the record of the case, as well as exhibits attached to the complaint).
 
 
 22
 Thus, on the facial challenge to Ordinance 288, we will review the district court's decision, insofar as it considered only the ordinance and its legislative history, as a ruling under Federal Rule of Civil Procedure 12(b)(6), and we review that ruling de novo.
 
 III
 
 23
 Traditionally, commercial speech was thought to be an aspect of a free market economy, providing information necessary to enable informed market decisions to be made. While commercial speech was subject to governmental regulation, such regulation was resisted by the same forces that favor open and competitive markets. Such speech was not, however, thought to be protected by the First Amendment. See, e.g., Valentine v. Chrestensen, 316 U.S. 52, 54, 62 S.Ct. 920, 921, 86 L.Ed. 1262 (1942). Beginning in 1975 with the Supreme Court's decision in Bigelow v. Virginia, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), and in 1976 with its decision in Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), a "measure" of First Amendment protection was afforded commercial speech in respect of its informational function. But that protection is significantly weaker than that accorded to the regulation of which is examined under the rubric of strict scrutiny. See Metromedia, Inc. v. San Diego, 453 U.S. 490, 505-07, 101 S.Ct. 2882, 2891-92, 69 L.Ed.2d 800 (1981) (plurality opinion). The Supreme Court has characterized the review of commercial speech regulation as one of intermediate scrutiny, see generally Florida Bar, --- U.S. at ---- - ----, 115 S.Ct. at 2375, which is consistent with the "subordinate position [of commercial speech] in the scale of First Amendment values." Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978).
 
 
 24
 Intermediate scrutiny of commercial speech regulation is conducted under the four-pronged scheme set forth in Central Hudson. Because the basis for affording protection to commercial speech pertains to its informational function, in order to be entitled to any First Amendment protection, the speech must (1) concern lawful activity and not be misleading. Central Hudson, 447 U.S. at 563, 100 S.Ct. at 2350. If the commercial speech meets that threshold prong, it may nevertheless be regulated if the government (2) asserts a substantial interest in support of its regulation; (3) demonstrates that the regulation "directly advances the governmental interest asserted"; and (4) demonstrates that the regulation is "narrowly drawn," i.e. "not more extensive than is necessary" to serve the governmental interest. Id. at 565-66, 100 S.Ct. at 2351. See also Florida Bar, --- U.S. at ----, 115 S.Ct. at 2375-77.
 
 
 25
 The first two prongs of Central Hudson are not disputed in this case. First, the purchase and consumption of alcoholic beverages are generally lawful, and no party claims that Baltimore's ordinance targets misleading advertising. And second, it is conceded that Baltimore City has a substantial interest in promoting "the welfare and temperance of [its] minors," the interest which it seeks to advance through Ordinance 288. The dispute in this case centers on the third and fourth prongs of Central Hudson--whether Ordinance 288 "directly advances" Baltimore City's interest in reducing underage drinking and whether the ordinance is not more extensive than necessary to serve that interest, i.e. whether it is "narrowly drawn." The inquiry required under these two prongs amounts to consideration of the "fit" between the City's ends and the means chosen to accomplish them. See Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico, 478 U.S. 328, 341, 106 S.Ct. 2968, 2976-77, 92 L.Ed.2d 266 (1986); United States v. Edge Broadcasting Co., --- U.S. ----, ----, 113 S.Ct. 2696, 2705, 125 L.Ed.2d 345 (1993).
 
 
 26
 The inquiry under Central Hudson 's third prong--whether the regulation directly advances the stated interest--does not involve as strict a nexus as that inherent in the traditional tort concept of causation. Rather, the inquiry seeks to elicit whether it was reasonable for the legislative body to conclude that its goal would be advanced in some material respect by the regulation. In Edge, where the federal regulation under consideration prohibited the broadcasting of lottery advertisements from facilities in North Carolina (in support of that state's anti-gambling policy), the Edge Broadcasting Company contended that the regulation did not advance the governmental interest at stake by sufficiently direct means. The company demonstrated that even though its broadcasting facility was located on the North Carolina side of the Virginia/North Carolina border, over 90% of its listeners were located in Virginia, where gambling was not illegal. It also noted that the federal regulation did not prohibit a Virginia-based broadcasting company from directing its signal to North Carolina listeners and advertising the Virginia lottery. The company argued, therefore, that the regulation did not directly advance the stated governmental interest of supporting North Carolina's anti-gambling policy. Rejecting the company's argument, the Supreme Court applied a standard that validated the legislature's commonsense judgment that its interests would be advanced by the regulation:Congress plainly made the commonsense judgment that each North Carolina station would have an audience in that State, even if its signal reached elsewhere and that enforcing the statutory restriction would insulate each station's listeners from lottery ads and hence advance the governmental purpose of supporting North Carolina's laws against gambling.
 
 
 27
 --- U.S. at ----, 113 S.Ct. at 2704. As the result of applying this standard the Court concluded, "We have no doubt that the statutes directly advanced the governmental interest at stake in this case.... [T]his would plainly be the case even if, as applied to Edge, there were only marginal advancement of that interest." Id. --- U.S. at ----, 113 S.Ct. at 2704.
 
 
 28
 Similarly, in Posadas the Court observed that it was reasonable for the Puerto Rico legislature to conclude that its interest in reducing its residents' demand for casino gambling would be advanced by placing limitations on casino advertising. See 478 U.S. at 341-42, 106 S.Ct. at 2977.
 
 
 29
 Again in Metromedia, the Court summarized this approach to the third prong of Central Hudson by noting that the reviewing court may be satisfied where the legislative judgment is "not unreasonable." 453 U.S. at 509, 101 S.Ct. at 2893. The Court applied that principle in upholding a ban on any billboard that constituted a distraction and therefore a hazard to traffic safety, even in the face of a claim that the record was "inadequate to show any connection between billboards and traffic safety." Id. at 508, 101 S.Ct. at 2893.
 
 
 30
 In each case where the Supreme Court affirmed the legislative judgment as reasonable, a logical correlation existed between the legislative objective and the means selected to achieve that objective. Thus in Edge, even though only 7.8% of Edge Broadcasting's listening public lived in North Carolina and even though that small population would still be subject to Virginia-based lottery advertisements, the Court concluded that North Carolina's anti-gambling policy would be advanced by prohibiting all lottery advertising by North Carolina-based facilities. See --- U.S. at ----, 113 S.Ct. at 2704. In Posadas, Puerto Rico's regulation prohibiting casinos from "advertis[ing] or otherwise offer[ing] their facilities to the public of Puerto Rico" was likewise found to advance Puerto Rico's interest in reducing its residents' demand for casino gambling. Id. at 341, 106 S.Ct. at 2976-77. Adding to the obviousness of that logic, the Supreme Court noted that "the fact that appellant has chosen to litigate this case all the way to this Court indicates that appellant shares the legislature's view." Id. at 342, 106 S.Ct. at 2977 (citing the statement from Central Hudson, "There is an immediate connection between advertising and demand for electricity [the advertised product]. Central Hudson would not contest the advertising ban unless it believed that promotion would increase its sales." 447 U.S. at 569, 100 S.Ct. at 2353).
 
 
 31
 In line with these precedents, we find that it was reasonable for the Baltimore City Council to have concluded that Ordinance 288's regulation of the outdoor advertising of alcoholic beverages directly and materially advances Baltimore's interest in promoting the welfare and temperance of minors. The City Council found that outdoor advertising is a unique and distinct medium which subjects the public to involuntary and unavoidable solicitation, and that children, simply by walking to school or playing in their neighborhood, are exposed daily to this advertising. The City Council pointed to its legislative finding that the majority of research studies show a definite correlation between alcoholic beverage advertising and underage drinking, while recognizing that not all studies have reached the same conclusion. There is a logical nexus between the City's objective and the means it selected for achieving that objective, and it is not necessary, in satisfying Central Hudson 's third prong, to prove conclusively that the correlation in fact exists, or that the steps undertaken will solve the problem. If that were required, communities could never initiate even minor steps to address their problems, for they could never be assured of the success of their efforts. The proper standard for approval must involve an assessment of the reasonableness of the legislature's belief that the means it selected will advance its ends. Under that approach, we conclude that Baltimore has met its burden of satisfying the third prong of Central Hudson.
 
 
 32
 Each circuit that has considered the regulation of alcoholic beverage advertising has likewise concluded that the regulation of advertising is reasonably aimed at reducing demand. In Dunagin, the Fifth Circuit stated:
 
 
 33
 We simply do not believe that the liquor industry spends a billion dollars a year on advertising solely to acquire an added market share at the expense of competitors. Whether we characterize our disposition as following the judicial notice approach taken in Central Hudson Gas, or following the "accumulated, common-sense judgment" approach taken in Metromedia, we hold that sufficient reason exists to believe that advertising and consumption are linked to justify the ban, whether or not "concrete scientific evidence" exists to that effect.
 
 
 34
 718 F.2d at 750. Similarly, in Oklahoma Telecasters Ass'n v. Crisp, 699 F.2d 490 (10th Cir.1983), rev'd on other grounds sub nom. Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984), the Tenth Circuit upheld a prohibition against advertising alcoholic beverages, stating:
 
 
 35
 [W]e hold, as a matter of law, that prohibitions against the advertising of alcoholic beverages are reasonably related to reducing the sale and consumption of those beverages and their attendant problems. The entire economy of the industries that bring these challenges is based on the belief that advertising increases sales.
 
 
 36
 Id. at 501, 101 S.Ct. at 2889. We now join these courts in holding that restricting the outdoor advertising of alcoholic beverages directly and materially advances the campaign against underage drinking.[5]
 
 
 37
 Turning to the fourth prong of the Central Hudson scheme, we must determine whether the government has demonstrated that its regulation of commercial speech "is not more extensive than is necessary" to serve the stated governmental interest. 447 U.S. at 556, 100 S.Ct. at 2343. In other words, the means selected to regulate speech must be narrowly tailored to serve a substantial state interest. See Florida Bar, --- U.S. at ----, 115 S.Ct. at 2375-77; Board of Trustees of the State Univ. of New York v. Fox, 492 U.S. 469, 478, 109 S.Ct. 3028, 3033-34, 106 L.Ed.2d 388 (1989). In assessing whether a regulation is narrowly tailored to serve the state's interest under an intermediate scrutiny framework, the Supreme Court has held that the fit between the regulation and the state's interest need not be perfect, but need only be reasonable. See Fox, 492 U.S. at 480, 109 S.Ct. at 3034-35. Summarizing the fourth prong of Central Hudson, the Court in Fox stated:
 
 
 38
 What our decisions require is a "fit" between the legislature's ends and the means chosen to accomplish those ends--a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served; that employs not necessarily the least restrictive means but, as we have put it in the other contexts discussed above, a means narrowly tailored to achieve the desired objective. Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed.
 
 
 39
 490 U.S. at 469, 109 S.Ct. at 1913 (citations and internal quotations omitted). Thus, if a regulation goes only "marginally beyond what would adequately have served the governmental interest," the regulation will not be invalidated; only when a regulation is "substantially excessive, disregarding far less restrictive and more precise means" will the regulation be invalidated under this prong of Central Hudson. Fox, 492 U.S. at 479, 109 S.Ct. at 3034 (citations and internal quotations omitted). And when there is no "far less restrictive and more precise means" available, the Court has accepted a broad ban of commercial advertising on the grounds that it was "perhaps the only effective approach." Metromedia, 453 U.S. at 508, 101 S.Ct. at 2893.
 
 
 40
 Satisfaction of the fourth prong of the Central Hudson test presents the closest question in this case. It is readily acknowledged that limitations on outdoor advertising of alcoholic beverages designed to protect minors also reduce the opportunities for adults to receive advertised information. And adults, who constitute a majority of the population, are not the object of the government's legislation. But it also appears that no less restrictive means may be available to advance the government's interest.
 
 
 41
 Anheuser-Busch argues that Baltimore could just as effectively advance its goal of promoting the welfare and temperance of minors by increasing enforcement of existing laws prohibiting sales to, and possession of alcoholic beverages by, minors, or by implementing and encouraging educational programs on the dangers of alcohol. These approaches might indeed prove beneficial in reducing underage drinking, but they do not provide an alternative to the approach selected by the City of curbing the enticement to consume alcoholic beverages. As the Supreme Court observed, quoting the Fifth Circuit in Dunagin:
 
 
 42
 "We do not believe that a less restrictive time, place and manner restriction, such as a disclaimer warning of the dangers of alcohol, would be effective. The state's concern is not that the public is unaware of the dangers of alcohol.... The concern instead is that advertising will unduly promote alcohol consumption despite known dangers."
 
 
 43
 Posadas, 478 U.S. at 344, 106 S.Ct. at 2978 (quoting Dunagin v. City of Oxford, Miss., 718 F.2d 738, 751 (5th Cir.1983) (en banc), cert. denied, 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984)).
 
 
 44
 If there were some less restrictive means of screening outdoor advertising from minors, or of reducing the area of billboard regulation in a manner that would have it focus more efficiently on reaching minors, the City would have to consider those alternatives. But it is not an acceptable response to the approach taken by the City of limiting advertising exposure to say that the City must abandon altogether an approach that directly advances its goal. In the face of a problem as significant as that which the City seeks to address, the City must be given some reasonable latitude. See Posadas, 478 U.S. at 346-47, 106 S.Ct. at 2979-80; Metromedia, 453 U.S. at 509, 101 S.Ct. at 2893; Ohralik, 436 U.S. at 455-56, 98 S.Ct. at 1918. Similar problems did not defeat the legislature's efforts in Posadas (where a ban that went substantially beyond the targeted population was upheld); in Edge (where a ban that was intended to apply to only 7.8% of the regulated company's listening public was upheld); or in Metromedia (where a ban on all billboards containing commercial advertising was upheld, even though some signs might not create a traffic hazard).
 
 
 45
 The problem of underage drinking is a most serious one that contributes significantly to a variety of social problems. Baltimore was faced with statistics showing that fully one-half of all deaths of minors were alcohol-related, and 40 to 50% of juveniles who drowned or had diving accidents had consumed alcohol immediately prior to the incident. The City Council found that alcohol is overwhelmingly and consistently the most widely used "drug" at all adolescent age levels. It pointed to data which showed that over half of all twelfth graders, 40% of tenth graders, and over a quarter of eighth graders reported that they consumed alcohol within the past 30 days. Widespread underage drinking was also found to be a major factor in crime. One-third of all juvenile males arrested said they had consumed alcohol within the previous 72 hours, and nearly 40% of all youths in adult correctional facilities reported drinking alcohol before committing their crime.
 
 
 46
 While it was readily recognized that regulating outdoor advertising would not wholly cure these problems, the regulation was one of the means recommended by the Governor's Prevention Commission, and it was responsive to numerous studies which link alcohol advertising and underage drinking. Through outdoor advertising, children are involuntarily and unavoidably confronted daily with the advertised message. See Packer Corp. v. Utah, 285 U.S. 105, 110, 52 S.Ct. 273, 274, 76 L.Ed. 643 (1932) (billboards are "seen without the exercise of choice or volition," and viewers have the message "thrust upon them by all the arts and devices that skill can produce"). The City argues that the only means to address this problem is to ban such advertising in locations where children generally walk and play. Such a ban still permits adults to receive advertising messages and information from signs in commercial areas of the City and through the numerous other media to which adults are constantly exposed.[6]
 
 
 47
 Although no ordinance of this kind could be so perfectly tailored as to all and only those areas to which children are daily exposed, Baltimore's efforts to tailor the ordinance by exempting commercial and industrial zones from its effort renders it not more extensive than is necessary to serve the governmental interest under consideration. Accordingly, we find that Baltimore's Ordinance 288 limiting the location of outdoor billboards advertising alcoholic beverages in the City of Baltimore meets Central Hudson 's fourth prong.
 
 
 48
 In summary, Baltimore City's regulation of stationary outdoor "advertising that advertises alcoholic beverages" in certain locations directly and materially advances a substantial governmental interest in promoting the welfare and temperance of minors who are involuntarily and unavoidably exposed to such advertisements. While the means selected of limiting the location of such outdoor advertising is not a perfect "fit" with the governmental objective, it nevertheless falls well within the range tolerated by the First Amendment for the regulation of commercial speech.
 
 IV
 
 49
 In addition to their facial challenge of Ordinance 288, Anheuser-Busch and Penn Advertising contend that "as applied" the ordinance will impermissibly restrict noncommercial speech. They argue that the prohibition of outdoor "advertising that advertises alcoholic beverages" would prohibit their noncommercial public service messages which, they maintain, address issues of public interest. On "at least seven" of its billboards in Baltimore City, Anheuser-Busch has devoted a portion of its advertising display space to public service messages, such as "Let's stop underage drinking before it starts," and "Take a friend home for the holidays--friends know when to say when." These messages also include the corporate logo for Anheuser-Busch or a reference to "Budweiser."
 
 
 50
 There are no allegations that Baltimore considers these signs to fall under the ordinance as "advertising that advertises alcoholic beverages." Indeed, Anheuser-Busch's complaint was filed before the ordinance was to take effect, and as a result, the enforcement of the ordinance has been stayed. Furthermore, the City has indicated that it does not intend to enforce the ordinance against noncommercial speech.
 
 
 51
 In addressing this argument, the district court observed that whether the public service messages actually constitute noncommercial speech is arguable. The court assumed, without deciding, that the ordinance would not apply to legitimate public service messages, but was unwilling to "render an advisory opinion solely to distinguish between legitimate [public service messages] and true advertisements." 855 F.Supp. at 821. The question of whether speech both advertising a product and providing a public service message constitutes commercial speech is not well settled and may rest strictly on factual findings.
 
 
 52
 It is settled that commercial speech is speech which does "no more than propose a commercial transaction." Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 66, 103 S.Ct. 2875, 2880, 77 L.Ed.2d 469 (1983) (citations and internal quotations omitted). But in Bolger the Court held that multi-page flyers published by a contraceptive manufacturing company to publicize the availability and desirability of contraceptives constituted commercial speech "notwithstanding the fact that they contain[ed] discussions of important public issues such as venereal disease and family planning." Id. at 67-68, 103 S.Ct. at 2881 (footnote omitted). The Court explained, "We have made clear that advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech." Id. at 68, 103 S.Ct. at 2881 (quoting Central Hudson, 447 U.S. at 563 n. 5, 100 S.Ct. at 2350 n. 5).
 
 
 53
 In this case, Ordinance 288 is directed only at commercial billboards advertising the sale of alcoholic beverages and does not facially regulate public service messages. The question of whether a particular billboard falls within the ordinance's proscription is, on the record before us, a hypothetical one. The City has not threatened to enforce its ordinance against such public service messages and has indicated that it does not intend to do so. Accordingly, we conclude that such an as-applied review of the ordinance must await an actual or threatened enforcement of the ordinance against a particular advertisement.
 
 
 54
 For the reasons stated, we affirm the judgment of the district court, upholding Baltimore City Ordinance 288 against a facial constitutional challenge under the First and Fourteenth Amendments.
 
 
 55
 AFFIRMED.
 
 
 
 [1]
 The district court also concluded that the protection afforded by Article 40 of the Maryland Declaration of Rights is no broader than that afforded by the First Amendment and that therefore the ordinance also did not violate the Maryland Constitution. That ruling is not appealed
 
 
 [2]
 The core provision of the ordinance provides:
 Alcoholic beverage advertisements. No person may place any sign, poster, placard, device, graphic display, or any other form of advertising that advertises alcoholic beverages in publicly visible locations. In this section "publicly visible locations" includes outdoor billboards, sides of buildings, and free standing signboards.
 Baltimore City Code, Art. 30 (zoning), Sec. 10.0-1(H).
 
 
 [3]
 The preamble to the ordinance refers to at least four studies considered by the City Council: (1) a report by the Prevention Committee of the Governor's Drug and Alcohol Abuse Commission, entitled "The Impact of Alcohol Advertising and the Use of Alcohol in Television Programs and Films on Underage Drinking"; (2) the "1992 Maryland Adolescent Drug Survey" conducted by the Maryland State Department of Education; (3) a report of the U.S. Inspector General, Department of Health and Human Services, entitled "Youth and Alcohol: Dangerous and Deadly Consequences"; and (4) a report of the U.S. Inspector General, Department of Health and Human Services, entitled "Youth and Alcohol: Drinking and Crime."
 
 
 [4]
 Amici curiae briefs, addressing principally the facial challenge under the First Amendment, were received from the Association of National Advertisers, Inc., the American Association of Advertising Agencies, The Media Institute, the National Association of Broadcasters, the Thomas Jefferson Center for the Protection of Free Expression, the Coalition for Beautiful Neighborhoods, the Baltimore City Wide Liquor Coalition for Better Laws and Regulations, and the Center for Science in the Public Interest
 
 
 [5]
 The rationale for the more general restriction prohibiting the advertising of alcoholic beverages, upheld in Dunagin and Crisp, may, however, be insufficient to support a general prohibition against price advertising of alcoholic beverages, even though such a restriction was upheld in 44 Liquormart, Inc. v. Rhode Island, 39 F.3d 5 (1st Cir.1994), cert. granted, --- U.S. ----, 115 S.Ct. 1821, 131 L.Ed.2d 743 (1995). Cf. Rubin v. Coors Brewing Co., --- U.S. ----, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995) (finding unconstitutional a labeling ban on the disclosure of alcohol content to combat "strength wars")
 
 
 [6]
 It is noteworthy that for similar reasons the FCC has prohibited cigarette advertising on television and other electronic media. See Public Health Cigarette Smoking Act of 1969, 15 U.S.C. Sec. 1331 et seq. (upheld in Capital Broadcasting Co. v. Mitchell, 333 F.Supp. 582 (D.D.C.1971), summarily aff'd. sub nom. National Assoc. of Broadcasters v. Kleindienst, 405 U.S. 1000, 92 S.Ct. 1290, 31 L.Ed.2d 472 (1972)). Yet parents have more control over children's exposure to television than they have over children's exposure to outdoor advertising