**GREATER NEW ORLEANS BROAD-CASTING ASSOCIATION, Et Al.,**
Plaintiffs–Appellants,

v.

**UNITED STATES of America and Federal Communications Commission,**
Defendants–Appellees.

No. 94–30732.

United States Court of Appeals,
Fifth Circuit.

Nov. 30, 1995.

Ashton R. Hardy, John Michael Lamers, Hardy & Carey, Metairie, LA, for appellant.

Scott R. McIntosh, Anthony J. Steinmeyer, Lisa A. Olson, U.S. Dept. of Justice, Appellate Staff, Civil Division, Washington, DC, Eddie J. Jordan, Jr., U.S. Atty., New Orleans, LA, for U.S. and Federal Communication Commission.

Eddie J. Jordan, Jr., New Orleans, LA, Scott R. McIntosh, Anthony J. Steinmeyer, Washington, DC, Lisa A. Olson, U.S. Dept. of Justice, Appellate Staff, Civil Division, Wash-

ington, DC, for U.S and Federal Communication Commission.

Before POLITZ, Chief Judge, and JONES and PARKER, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Greater New Orleans Broadcasters Association (GNOBA) and a group of television and radio stations in the New Orleans metropolitan area (collectively "the Broadcasters") unsuccessfully challenged in district court the constitutionality of a federal statute prohibiting the broadcast of radio and television advertisements for casino gambling. 18 U.S.C. § 1304. While recognizing that the advertisements were entitled to limited protection under the First Amendment, the district court concluded that the governmental interests served by the statute were sufficient to override the First Amendment under the Supreme Court's commercial speech jurisprudence. We affirm.

## BACKGROUND

GNOBA is a non-profit corporation organized for the purpose of representing its membership as a trade association in matters affecting the broadcast industry. Each member broadcaster of GNOBA is licensed to a primary place of business in Louisiana. The members want to broadcast advertisements for casino gambling activities, which are licensed and legal in Louisiana and in neighboring Mississippi, but have refrained from doing so for fear of criminal prosecution and sanctions pursuant to 18 U.S.C. § 1304 and 47 C.F.R. § 73.1211, the corresponding FCC regulation.

Section 1304 prohibits broadcast advertising of "any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance...." 18 U.S.C. § 1304. In February 1994, the Broadcasters filed suit against the United States and the FCC seeking declaratory and injunctive relief permitting them to broadcast gambling advertisements for Louisiana

and Mississippi casinos. The Broadcasters first asserted that section 1304 is inapplicable because casino gambling is not a "lottery, gift enterprise, or similar scheme" for purposes of the statute. Alternatively, the Broadcasters contended that section 1304 is an unconstitutional abridgement of their First Amendment free speech rights. The Broadcasters and the government each moved for summary judgment.

In November 1994, the district court entered summary judgment in favor of the government. Citing *FCC v. American Broadcasting Co.*, 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699 (1954), the court concluded that casino advertising falls within the purview of section 1304. The court then determined that under the four-part test set forth in *Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), section 1304 is a permissible regulation of commercial speech. The Broadcasters now appeal from both holdings.

## DISCUSSION

The Broadcasters renew their contention that section 1304 does not prohibit advertisements for casino gambling because casino games cannot be considered a "lottery, gift enterprise or similar scheme." However, this argument is foreclosed by Supreme Court precedent. In *FCC v. American Broadcasting Co.*, 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699 (1954), the Court held that the three essential elements of section 1304 are 1) the distribution of prizes, 2) according to chance, 3) for a consideration. *Id.* at 290, 74 S.Ct. at 598. Rather than disputing that casino gambling possesses these three essential elements, the Broadcasters ignore this authority entirely.

Instead, the Broadcasters choose to attack the historical underpinnings of the statute in an attempt to demonstrate that the statute was never intended to apply to casino gambling. Apparently, the Broadcasters are laboring under the misperception that this court is free to reject statutory interpretations handed down by the Supreme Court. This we cannot do. As the Broadcasters

point out, section 1304 is becoming increasingly riddled with exceptions to its broad application, *see infra* note 4. That legislation has been proposed, and rejected, by Congress which would have excepted broadcast advertisements for casino gambling from section 1304's reach,[1] reaffirms the Court's broad interpretation of section 1304 in *American Broadcasting.* Therefore, section 1304 is applicable and continues to ban the desired advertising. *Accord Valley Broadcasting Co. v. U.S.*, 820 F.Supp. 519, 524 (D.Nev.1993).

■ Turning to the constitutionality of section 1304, the proposed advertisements fall within the Supreme Court's definition of commercial speech because they involve "expression related solely to the economic interests of the speaker and its audience" and do "no more than propose a commercial transaction." *Virginia Pharmacy Board v. Virginia Citizens Consumer Council,* 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976).

■ "[C]ommensurate with its subordinate position in the scale of First Amendment values," *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978), commercial speech is entitled to only limited protection under the First Amendment.

> For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351. Applying the four-part *Central Hud-son* test to the facts at hand is the crux of this case.

The first prong, whether the speech concerns lawful activity and is not misleading, is not in dispute. The government concedes that the Broadcasters seek only to broadcast truthful advertising about lawful casino gambling activities. The broadcasters have chosen to center their argument on the second prong—the nature and substantiality of the federal government's interest in prohibiting broadcast advertisements of casino gambling.

■ The government asserts two interests it contends are substantial. First, section 1304 serves the interest of assisting states that restrict gambling by regulating interstate activities such as broadcasting that are beyond the powers of the individual states to regulate. The second asserted governmental interest lies in discouraging public participation in commercial gambling, thereby minimizing the wide variety of social ills that have historically been associated with such activities. The district court found both of these interests to be substantial. We agree.[2]

■ The Broadcasters assault the federal interests in a number of ways. First, the Broadcasters attempt to characterize *United States v. Edge Broadcasting Co.,* — U.S. ——, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993), as precluding the assertion of any substantial federal interest other than protecting state choice in gambling decisions. *Edge* makes no such broad claim. That case interpreted a companion provision to section 1304, which expressly permits advertising of state-run lotteries by broadcasters in states where the lotteries exist, while prohibiting it by non-lottery-state broadcasters. *Edge* surely determined that the governmental interest in protecting state choice in gambling decisions is substantial, a holding which applies here.

1. *See* 134 Cong.Rec. 12,278–82 (1988); 134 Cong.Rec. 31,073–76 (1988).

2. The government may permissibly assert that multiple interests are served by a given statute, only one of which need be substantial. *See, e.g., Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 71–73, 103 S.Ct. 2875, 2883–84, 77 L.Ed.2d 469 (1983). Further, "the insufficiency of the original motivation does not diminish other in-terests that the restriction may now serve." 463 U.S. 60, 71–73, 103 S.Ct. 2875, 2883–84, 77 L.Ed.2d 469. *Id.* at 71, 103 S.Ct. at 2883. *See also Doe v. Bolton,* 410 U.S. 179, 190–91, 93 S.Ct. 739, 746–47, 35 L.Ed.2d 201 (1973) (a State may readjust its views and emphases in light of modern knowledge). Even if one of the government's arguments falters, the other can support the statute.

But just as surely, it did not determine the limit of a valid federal governmental interest. *Edge* in no way suggests that the general prohibition on casino gambling advertising was rendered doubtful by the Court's approval of a "state choice" advertising policy for state lotteries. *Edge* supports rather than impairs the constitutionality of section 1304.

■ Audaciously, the Broadcasters next challenge the federal government's interest in limiting the promotion of certain forms of gambling by means of interstate commerce. The validity as well as substantiality of the federal interest in regulating gambling's interstate manifestations, are, however, as old as the legislation prohibiting use of the federal mails for advertising state-chartered lotteries. Act of July 12, 1876, ch. 186 § 2, 19 Stat. 90, upheld in *Ex parte Jackson,* 96 U.S. 727, 24 L.Ed. 877 (1877). *See also Champion v. Ames,* 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903) (*Lottery Case*), sustaining under the commerce clause a federal law prohibiting interstate transportation of lottery tickets. Act of March 2, 1895, ch. 191, 28 Stat. 963. As recently as 1986, this court rejected the argument that changing mores, which have led more states to legalize various forms of gambling, should eliminate the federal interest in prosecuting violations of the federal law prohibiting interstate transportation of lottery paraphernalia. *United States v. Stuebben,* 799 F.2d 225 (5th Cir. 1986). Here the vehicle of commerce is the interstate airwaves and the commerce consists of casino gambling advertisements offered by the Broadcasters. Because Congress has the power to legislate with regard to the use of organs of interstate commerce, it has the power to determine the ends served by that power and whether federal policy will promote or inhibit the states' policies on similar subjects.[3]

The Broadcasters also attack the governmental interest in discouraging public participation in commercial gambling on federalism grounds. They contend that the federal government may not assert an interest in the public's health, safety, and welfare that is contrary to state policy. In other words, the federal government has no interest in discouraging casino gambling if Louisiana has legalized it. This argument is contrary to Supreme Court precedent.[4] The Court has consistently, and recently, noted the federal government's interest in protecting the health, safety, and welfare of its citizens. In *Rubin v. Coors Brewing Co.,* —— U.S. ——, ——, 115 S.Ct. 1585, 1591, 131 L.Ed.2d 532 (1995), the Court struck down a federal statute prohibiting the display of alcohol content on beer labels. Analyzing the statute under *Central Hudson,* however, the Court found that the federal government's asserted interest, preventing strength wars over the content of alcoholic beverages, was substantial. *Rubin,* —— U.S. at ——, 115 S.Ct. at 1591. The Court specifically acknowledged that the prevention of alcohol strength wars was aimed at "protecting the health, safety, and welfare of ... citizens...." *Id. See also Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 72–73, 103 S.Ct. 2875, 2883–84, 77 L.Ed.2d 469 (1983) (federal government had substantial interest in aiding parents in the upbringing of their children). The Broadcasters have cited no contrary authority, relying instead on an amalgam of general federalism statements.

■ Taking as valid the federal government's interest in the health, safety, and welfare of its citizens, there remains only to be determined whether the goal of discouraging participation in gambling is substantial. *Posadas de Puerto Rico Assoc. v. Tourism*

---

**3.** In *The Lottery Case,* Justice Harlan summed up the authorities as holding that "the power to regulate commerce among the several states is vested in Congress as absolutely as it would be in a single government ...; that such power is plenary, complete in itself, and may be exerted by Congress to its ultimate extent, subject *only* to such limitations as the Constitution imposes...." 188 U.S. at 353, 23 S.Ct. at 325–26. (emphasis in original).

**4.** It is also contrary to the weight of authority in the analogous cigarette advertising context. *See Capital Broadcasting Co. v. Mitchell,* 333 F.Supp. 582, 584–86 (D.C.D.C.1971), *aff'd,* 405 U.S. 1000, 92 S.Ct. 1289, 31 L.Ed.2d 472 (1972) (upholding constitutionality of 15 U.S.C. § 1335 forbidding cigarette advertising via electronic media).

*Co.,* 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986), confirms that it is.

*Posadas* involved virtually identical facts. Although the commonwealth of Puerto Rico licensed and legalized casino gambling, it prohibited advertisements aimed at its own citizens in an attempt to discourage their participation in gambling. Upholding the constitutionality of the advertising prohibition, the Supreme Court's analysis of the second prong of the *Central Hudson* test was perfunctory: "We have no difficulty in concluding that the Puerto Rico Legislature's interest in the health, safety, and welfare of its citizens constitutes a 'substantial' governmental interest." *Id.* at 341, 106 S.Ct. at 2977. Likewise, this court has no difficulty in determining that the very same federal interest is substantial.

■ The third and fourth prongs of the *Central Hudson* analysis concern the "fit" between the interest asserted and the means employed. Having been unable to dispel the substantial federal interests, the Broadcasters face a much more difficult challenge on the last two parts of the *Central Hudson* analysis. They cannot seriously dispute that a prohibition of advertising casino gambling directly advances the governmental interest in discouraging such gambling and fulfills the third *Central Hudson* prong. It is axiomatic that the purpose and effect of advertising is to increase consumer demand. *See Posadas,* 478 U.S. at 342, 106 S.Ct. at 2977; *Central Hudson,* 447 U.S. at 569, 100 S.Ct. at 2353. As noted in both *Posadas* and *Edge,* the vigor with which the statute has been challenged confirms the efficacy of the prohibition.

The Broadcasters complain that the various exceptions to section 1304 [5] so emasculate the statute as to render it ineffective in advancing the governmental interest, and in-

deed calls into question the genuineness of the asserted governmental interest. The same type of argument was proffered, and rejected, in *Posadas,* 478 U.S. at 342–43, 106 S.Ct. at 2977 (legislature need not forbid advertising for all games of chance to satisfy third prong of *Central Hudson*). The Court's striking down a prohibition of labelling the alcoholic strength of beer, in *Rubin, supra,* does not change this result. In that case, the Court cited a number of federal laws whose impact on the promotion of stronger alcoholic beverages varies and conflicts, and called the entire scheme irrational. —— U.S. at ——, 115 S.Ct. at 1592. Because of these conflicts, the prohibition at issue could not achieve its purpose. That situation does not exist here. Congress has singled out particular forms of gaming for which broadcast advertising is permitted, and in so doing made legitimate, quintessentially legislative choices that the social costs of those activities were less than those of casino gambling, or the social benefits, e.g. of state-run lotteries, Indian and charitable gambling, were greater.[6] Needless to say, the statutory prohibition on broadcast advertising also reinforces the policies of states neighboring Louisiana, such as Texas, which do not permit casino gambling.

■ The Broadcasters nevertheless argue that permitting other forms of media to advertise casino gambling undercuts the government's contention that section 1304 directly advances the asserted interests. This attack was rejected by the Supreme Court in *Edge,* —— U.S. at ——, 113 S.Ct. at 2707. The Court explained:

Nor do we require that the Government make progress on every front before it can make progress on any front. If there is an immediate connection between advertising and demand, and the federal regulation decreases advertising, it stands to reason

---

**5.** Excepted from section 1304's application are advertisements for 1) fishing contests, 18 U.S.C. § 1305; 2) wagers on sporting events, 18 U.S.C. § 1307(d); 3) state lotteries, 1307(a)(1), (2); 4) Indian gaming of all types, 25 U.S.C. § 2701; 5) charitable lotteries, 18 U.S.C. § 1307(a)(2)(A); 6) governmental lotteries, 18 U.S.C. § 1307(a)(2)(A); 7) occasional and ancillary commercial lotteries, 18 U.S.C. § 1307(a)(2)(B).

**6.** The alleged underinclusiveness of section 1304 is also advanced by the Broadcasters as a ground for disputing the substantiality of the federal interest, *Central Hudson*'s second prong. We reject that attack for the reasons stated above, and note that in *Rubin,* the complexity of the statutory scheme was analyzed as part of the third *Central Hudson* factor. —— S.Ct. at ——, 115 S.Ct. at 1592.

that the policy of decreasing demand for gambling is correspondingly advanced.

*Id. See also Central Hudson,* 447 U.S. at 569, 100 S.Ct. at 2353; *Dunagin v. City of Oxford,* 718 F.2d 738, 747–51 (5th Cir.1983) (en banc), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 3554, 82 L.Ed.2d 855 (1984) (law prohibiting local liquor advertising directly advances government's interest in discouraging liquor consumption despite fact that residents are exposed to liquor advertising from out-of-state sources). Therefore, section 1304 easily satisfies the third prong of the *Central Hudson* test.[7]

 The fourth requirement, that the restriction be no more extensive than necessary to serve the government's interest, is also met. This prong of *Central Hudson* is not, as the Fifth Circuit recently observed, a "least restrictive means" test, but requires only that the regulation's restrictions reasonably fit the desired objective. *Moore v. Morales,* 63 F.3d 358, 361 (5th Cir.1995), citing *Florida Bar v. Went For It, Inc.,* —— U.S. ——, ——, 115 S.Ct. 2371, 2379, 132 L.Ed.2d 541 (1995). *Posadas* is again compelling. The Supreme Court found it "clear beyond peradventure" that the challenged Puerto Rican law satisfied the fourth *Central Hudson* prong. *Posadas,* 478 U.S. at 343, 106 S.Ct. at 2978. Section 1304 is equally tailored to the asserted governmental interests because it prohibits only broadcast advertising aimed at the promotion of casino gambling. To the extent public demand for casino gambling is reduced by section 1304, one governmental interest is fulfilled. To the extent the broadcasters cannot beam casino gambling advertisements into neighboring states that do not license private casinos, the federal government's goal of assisting states' anti-gambling policies is fulfilled. No less restrictive alternative seems viable in view of the ability of broadcast signals to cross state borders. In particular, the *Edge* "state choice" policy embodies a compromise that supports states' promotion of their own lotteries. Although Congress could craft a similar compromise for advertising of casino gambling, it has rejected that course, and we do not find it constitutionally mandated.

A final note. In *Edge,* the Court stated that gambling "falls into a category of 'vice' activity that could be, and frequently has been, banned altogether", —— U.S. at ——, 113 S.Ct. at 2703, and clearly implied that advertising of gambling can lay no greater claim on constitutional protection than the underlying activity. *See also Posadas,* 478 U.S. at 345–46, 106 S.Ct. at 2979; *Meyer v. Grant,* 486 U.S. 414, 424, 108 S.Ct. 1886, 1893, 100 L.Ed.2d 425 (1988). In *Rubin,* however the Court distanced itself from this position, —— U.S. at —— n. 2, 115 S.Ct. at 1589 n. 2. This is too bad. Drawing a distinction for traditional vice activity, such as gambling or prostitution, would provide a clear constitutional guideline, would free legislatures to make the delicate judgements required when legislating about these activities, and would avoid repetitious litigation over *Central Hudson* in a limited category of cases. Clarity is a virtue seldom attained and too seldom even prized in constitutional law.

## CONCLUSION

In summary, section 1304 and the concomitant FCC regulation constitutionally prohibit broadcast advertisements for casino gambling. The statute directly advances the government's substantial interests in discouraging public participation in such gambling and in enforcing states' anti-gambling policies in a manner no more extensive than necessary.[8]

AFFIRMED.

---

7. Additionally, Congress is permitted more intrusive regulation of the broadcast media than other forms of media. *See Turner Broadcasting System, Inc. v. FCC,* —— U.S. ——, ——, 114 S.Ct. 2445, 2456, 129 L.Ed.2d 497 (1994); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 388–9, 89 S.Ct. 1794, 1805–06, 23 L.Ed.2d 371 (1969).

8. *But see Valley Broadcasting Co.,* 820 F.Supp. at 525–27. In *Valley Broadcasting Co.,* the district court struck down as unconstitutional section 1304 finding that it did not directly advance the governmental interest asserted and was more extensive than necessary to serve the governmental interest. For the reasons stated above, we find that under a proper reading of *Central Hudson* and *Posadas,* section 1304 withstands constitutional scrutiny.

POLITZ, Chief Judge, dissenting:

Persuaded that the values underlying the first amendment commercial speech doctrine compel rejection of a regulatory scheme riddled with such inconsistencies and exceptions as to result in suppression of speech without adequate justification, I must respectfully dissent.

As the Supreme Court has made abundantly clear, the first amendment protects the interest of the listener in the free flow of truthful, non-misleading commercial speech. The doctrine respects the individual's right to information relevant to the making of lawful choices [1] and to the formation and expression of opinions regarding governmental regulation of products or activities.[2]

This basis for the protection of commercial speech is not vitiated when the speech concerns lawful but potentially harmful activities, such as alcohol consumption or gambling.[3] When the government would forbid dissemination of information about things which legally may be done, the *Central Hudson* test ought be carefully conducted in order to protect these core first amendment values.

The government seeks to justify a nationwide ban on broadcasts of commercial messages discussing the gambling activities in state-licensed casinos. Given the social ills often associated with gambling, it cannot be gainsaid that the interests asserted in support of this ban are substantial. The *Central Hudson* test, however, requires that the government demonstrate that its interests are *materially* advanced by the ban,[4] and that the ban is no more restrictive than necessary to serve that interest. Irrational regulatory scenarios in which certain provisions undermine and counteract the asserted government interest do not satisfy the "material advancement" prong of the *Central Hudson* test.[5]

The government claims an independent federal interest in discouraging public participation in commercial gambling. The restriction at bar is the awkward residual of 18 U.S.C. § 1304, originally enacted as section 316 of the Communications Act of 1934 to ban broadcast advertising of gambling. That ban is now deeply gutted by exceptions and in conflict with the policies of many states which have legalized gambling.[6] The broadcasters challenge the regulation to the extent it bans commercial broadcast messages directly referring to legal casino gambling.

A focusing of what can and cannot be done under the challenged regulation appears in order. Casinos are allowed to advertise their existence, to air the word "casino" as part of a legal name, and to refer to the non-gambling amenities within.[7] In instances where state-licensed casino gambling is advertised on billboards and in newspapers, where other legal gambling entities broadcast pro-gambling messages, and where casinos may broadcast their existence and the "excitement" to be had within, I suggest that a

1. *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 562, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980) (rejecting "paternalistic" rationale for suppressing commercial speech in favor of view that people are capable of perceiving their own best interests if well-informed).

2. *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 765, 96 S.Ct. 1817, 1827, 48 L.Ed.2d 346 (1973) ("[T]he free flow of commercial information is indispensable ... to the proper allocation of resources in a free enterprise system ... [and] to the formation of intelligent opinions as to how that system ought to be regulated or altered.").

3. The Supreme Court recently affirmed that restrictions on speech about legal "vices" are reviewed under the *Central Hudson* standard rather than by a more deferential approach. *Rubin v. Coors Brewing Co.*, —— U.S. ——, —— n. 2, 115 S.Ct. 1585, 1589 n. 2, 131 L.Ed.2d 532 (1995).

4. The "direct advancement" prong of *Central Hudson* is not satisfied by "mere speculation and conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, —— U.S. ——, ——, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1993).

5. *Coors*, —— U.S. at ——, 115 S.Ct. at 1592.

6. An unofficial count reflects at least 21 states.

7. *See, e.g.*, Letter to DR Partners, 8 F.C.C.R. 44 (1992).

faithful application of *Central Hudson* compels the conclusion that the residual ban on broadcasting direct references to the games played in casinos amounts to little more than a gratuitous suppression of expression. Under these circumstances, and given the abundance of broadcast advertising for casinos, the challenged censorship serves little purpose. The government cannot show that this restriction decreases demand for casino gambling to any appreciable extent. While the government is not required, of course, to make progress on every front in advancing its interests, this ban is so pockmarked with exceptions and buffeted by countervailing state policies that it provides, at most, a very minimum support for the asserted interest. I am persuaded that the government has not met its burden of proving material advancement of its interest.

The government also asserts that the ban advances the federal interest in supporting policies of states which have chosen to prohibit casino gambling. Messages banned by the statute cannot be broadcast by any station licensed in the United States. Accordingly, residents of non-casino states cannot receive such messages from broadcasts originating in states where casino gambling is legal. Nor may residents of the casino states.

Recognizing a value in advancing the government's interest in aiding state anti-gambling policies, we must measure the extent of the restriction and weigh countervailing forces. The ban is nationwide. Some states allow casino gambling; some states do not. By not cabining the regulation to radio and television stations in non-casino states, the ban impinges unnecessarily on the policies of states which have legalized casino gambling. A substantial federal interest in protecting state choice in gambling decisions, by limiting bans on lottery advertising to stations licensed by non-lottery states, was asserted and recognized in *United States v. Edge Broadcasting Co.*[8] The ban at bar is overbroad and is inconsistent with the teachings of *Edge*, failing to accommodate the valid federalism interest inherent in supporting the casino-licensing states.[9]

Unlike the statutory scheme upheld in *Edge*, the ban before us allows stations in states where gambling is illegal to broadcast commercial messages promoting a gambling forum in another state, so long as the gambling activities taking place in that establishment are not explicitly referenced.[10] This "policy" simply magnifies the government's failure to prove material advancement of its interest in supporting the policies of non-casino states and guts its argument that a nationwide ban is mandated for an effective insulation of non-casino states from casino advertisements broadcast across state borders.

I respectfully dissent.

---

**8.** —— U.S. ——, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993).

**9.** In contrast, *Posadas de Puerto Rico Associates v. Tourism Co.*, 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986), presented the issue whether a state's restriction on commercial speech is necessary to a balance of its *own* competing interests, in promoting tourism while protecting its own population.

**10.** Federal Communications Commission policy allows a station in a non-casino state to broadcast an advertisement promoting a casino so long as use of the word "casino" is confined to the establishment's proper name and other references to gambling are not explicit. *See, e.g.,* Letter to Calvenar Broadcasting, Inc., 8 F.C.C.R. 32 (1992).