# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

## No. 94-30732
_____

**GREATER NEW ORLEANS BROADCASTING ASSOCIATION, ET AL.,**

**Plaintiffs-Appellants,**

**versus**

**UNITED STATES OF AMERICA and FEDERAL COMMUNICATIONS COMMISSION,**

**Defendants-Appellees.**

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____

July 30, 1998
ON REMAND FROM THE UNITED STATES SUPREME COURT

Before POLITZ, Chief Judge, JONES, and PARKER, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The Supreme Court remanded this case for reconsideration in light of 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 116 S. Ct. 1495 (1996). Concluding that 44 Liquormart requires us to revise the Central Hudson[1] analysis in our previous opinion, we amend that opinion but nevertheless affirm the judgment of the district court.

_____

[1] Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557, 100 S. Ct. 2343 (1980)

What seemed a fairly straightforward analysis when this panel first considered the constitutionality of the federal statute prohibiting the broadcast of radio and television advertisements for casino gambling, 18 U.S.C. § 1304, has dissolved into a welter of confusion following 44 Liquormart. On one hand, in 1993, the Supreme Court upheld a companion provision that bans some broadcast advertising of state-sponsored lotteries, and five Justices approved the following statement:

> In response to the appearance of state-sponsored lotteries, Congress might have continued to ban all radio or television lottery advertisements, even by stations in States that have legalized lotteries.

United States v. Edge Broad. Co., 509 U.S. 418, 428, 113 S. Ct. 2696, 2704 (1993). On the other hand, after 44 Liquormart was decided, the Ninth Circuit felt obliged to hold unconstitutional the provision at issue in this case, which bans radio and television advertisements for privately-run casino gambling.[2] Has Edge lost its edge in the succeeding five years? Or on the contrary, has the rule of Edge, become a constitutional mandate? Such that Congress can now ban broadcast advertisements for gambling only in states that prohibit such gambling? Finally, has the Supreme Court gone over the edge in constitutionalizing speech protection for socially harmful activities? The following

---

[2] *See* Valley Broad. Co. v. United States, 107 F.3d 1328 (9th Cir. 1997), *cert. denied*, 118 S. Ct. 1050 (1998).

2

discussion will suggest that the Supreme Court's jurisprudence has become as complex and difficult to rationalize as the statutory advertising regulations the Court has condemned.[3]

To put the discussion in perspective, it is necessary to review this court's previous application of the Central Hudson balancing test to § 1304. Section 1304 prohibits broadcast advertising of "any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes depending in whole or in part upon lot or on chance . . . ." This court applied the four-part test set forth in Central Hudson to determine whether § 1304 is a permissible regulation of commercial speech. Central Hudson recognized that truthful, non-misleading commercial speech is entitled to limited protection under the First Amendment. The first two prongs of the test are satisfied here: the casino owners' speech concerns lawful activity and is not misleading, and the government asserts substantial public interests in discouraging public participation in commercial gambling and in assisting states that restrict gambling by regulating broadcasting that is beyond the states' regulatory powers.[4]

---

[3] *See* 44 Liquormart, 517 U.S. 484, 116 S. Ct. 1495 (1996); Rubin v. Coors Brewing Co., 514 U.S. 476, 115 S. Ct. 1585 (1995).

[4] *See* Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico, 478 U.S. 328, 341, 106 S. Ct. 2968, 2977 (1986) ("We have no difficulty in concluding that the Puerto Rico legislature's interest in the health, safety, and welfare of its citizens constitutes a 'substantial' governmental interest.").

The majority and dissent in our earlier opinion parted company over application of the third Central Hudson standard, which inquires whether the advertising ban contained in § 1304 "directly advances the governmental interest asserted." The majority relied on numerous assertions by the Supreme Court that the purpose and effect of advertising are to increase consumer demand and, conversely, that limits on advertising will dampen such demand. See Edge, 509 U.S. at 433-34, 113 S. Ct. at 2707; Posadas, 478 U.S. at 342, 106 S. Ct. at 2977; Central Hudson, 447 U.S. at 569, 100 S. Ct. at 2353. The majority distinguished the Supreme Court's striking down of a federal prohibition on labeling the alcoholic strength of beer, where the entire legislative scheme represented an "irrational" patchwork and actually approved promotional advertising of stronger alcoholic beverages. Rubin v. Coors Brewing Co., 514 U.S. 476, 486-87, 115 S. Ct. 1585, 1591-92 (1995). The panel's dissent, however, relied heavily on Rubin to emphasize that federal law embodies a ban on advertising various forms of gambling "so pockmarked with exceptions and buffeted by countervailing state policies that it provides, at most, a very minimum support for the asserted interest."[5] Greater New Orleans

___

[5] Excepted from § 1304's application are advertisements for (1) fishing contests, 18 U.S.C. § 1305; (2) wagers on sporting events, 18 U.S.C. § 1307(d); (3) state lotteries, Id. § 1307(a)(1), (2); (4) Indian gaming of all types, 25 U.S.C. § 2701; (5) charitable lotteries, 18 U.S.C. § 1307(a)(2)(A); (6) governmental lotteries, Id. § 1307(a)(2)(A); and (7) occasional and ancillary

Broad. Ass'n. v. United States, 69 F.3d 1296, 1304 (Politz, C.J., dissenting), vacated, 117 S. Ct. 39 (1996).

This Court's majority and dissenting decisions also disagreed about the fourth Central Hudson criterion, which analyzes whether § 1304 cabins speech no more than necessary to serve the government's interests. The majority relied on an understanding that this prong of Central Hudson is not a "least restrictive means" test and that it requires only that the regulation's restrictions reasonably fit the desired objective. *See* Greater New Orleans Broad., 69 F.3d at 1302 (citing Florida Bar v. Went For It, Inc., 515 U.S. 618, 630-31, 115 S. Ct. 2371, 2379 (1995)). The majority then relied on Posadas, a decision which granted deference to the tailoring decision of the Puerto Rican legislature. *See* Greater New Orleans Broad., 69 F.3d at 1302. In Posadas, Puerto Rico was permitted to ban casino gambling advertising aimed at its residents, while permitting them to be solicited for other wagering games like cock fights. This court's dissenting member believed, however, that the § 1304 broadcast advertising ban is overbroad, because it fails to accommodate the policies of states that have legalized casino gambling. *See id.* at 1304 (Politz, C.J., dissenting).

---

commercial lotteries, Id. § 1307(a)(2)(B).

5

After our panel issued its split decision, 44 Liquormart became the Supreme Court's newest pronouncement on the protection of commercial speech under the first amendment. At issue in 44 Liquormart was the constitutionality of a Rhode Island law that banned all advertisement of liquor prices outside the beverage stores' sales premises. The Supreme Court overturned the statute, and while the Court declined to modify the Central Hudson test, it divided over the interpretation of the third and fourth prongs. Justice Stevens, writing for four members, would require Rhode Island to show, for purposes of the third prong, that the statute directly advanced the state's asserted interest in promoting temperance by demonstrating that the advertising ban significantly reduced alcohol consumption. *See* 44 Liquormart, 517 U.S. at 505-06, 116 S. Ct. at 1509-10. Justice O'Connor, writing for three members of the court, pointedly declined to adopt Justice Stevens's approach on the third prong. *See id*. at 529-32, 116 S. Ct. at 1521-22 (O'Connor, J., concurring). Thus, after 44 Liquormart, what level of proof is required to demonstrate that a particular commercial speech regulation directly advances the state's interest is unclear.

The Court was nearly uniform, however,[6] concerning

---

[6] Justice Thomas would abandon Central Hudson altogether and accord "commercial speech" the full protection of the First Amendment. *See* 44 Liquormart, 517 U.S. at 518-28, 116 S. Ct. at

<u>Central Hudson</u>'s fourth prong: the justices were willing to scrutinize more carefully whether the state's chosen regulation of commercial speech is closely enough tailored to serve the governmental interests without unduly burdening free speech. In particular, the Court decided, in the context of an outright ban of certain commercial speech,[7] to consider the availability of other, non-speech-related policies or measures that would more directly accomplish the state's purposes. Because the state's asserted goal was to deter price competition, in order to keep prices high and ultimately reduce liquor consumption, the Court pointed out the availability of taxation and minimum price regulation to accomplish that objective directly.

Eight members of the Court also ruled out the deference to the legislature demonstrated in the <u>Posadas</u> case with respect to restrictions on commercial speech. As Justice O'Connor put it,

> The closer look that we have required since <u>Posadas</u> comports better with the purpose of the analysis set out in <u>Central Hudson</u>, by requiring the state to show that the speech restriction directly advances its interest and is narrowly tailored.

<u>44 Liquormart</u>, 517 U.S. at 531-32, 116 S. Ct. at 1522.

---

1515-20 (Thomas, J., concurring). Justice Scalia, while indicating discomfort with <u>Central Hudson</u>, was not ready to abandon it yet but concurred only in the judgment overturning the statute. *See id*. at 517-18, 116 S. Ct. at 1515 (Scalia, J., concurring).

[7] No alternative channels were permitted for liquor sellers to publicize the price of their products off-premises.

The broadcasters rely heavily on Justice Stevens's opinion in 44 Liquormart. Justice Stevens contended that Rhode Island could satisfy the third Central Hudson prong only on an evidentiary showing that the price advertising ban would significantly reduce alcohol consumption. His approach, however, did not command majority support on the Court and, viewed in the context of that case, does not alter this facet of the Central Hudson standard. The state was using a speech restriction to influence consumption indirectly by affecting liquor prices rather than either using a speech regulation directly to shrink the demand for liquor or by simply regulating its price. The connection between the speech regulation and state policy was not "direct." Indeed, 44 Liquormart does not disturb the series of decisions that has found a commonsense connection between promotional advertising and the stimulation of consumer demand for the products advertised. See, e.g., Central Hudson, 447 U.S. at 569, 100 S. Ct. at 2353 (finding "an immediate connection between advertising and demand for electricity").

Having sketched both this court's previous opinion and 44 Liquormart, we turn to the remand.

To the extent that the Court's remand provides a general opportunity to reconsider our opinion, it must be noted that the Ninth Circuit in Valley Broadcasting Co. v United States, 107 F.3d 1328 (9th Cir. 1997), agreed with the dissenter in this case and

8

concluded that § 1304 could not materially advance the government's interest in discouraging casino gambling. The Ninth Circuit relied upon an exception in § 1304 that expressly permits broadcast advertising for Indian-operated casino gambling, as well as exceptions that permit similar promotion of state lotteries and local charitable gambling,[8] and found these provisions as inconsistent with the government's asserted interests as the alcohol strength regulation at issue in Rubin. The Ninth Circuit's point derives not from 44 Liquormart, but from Rubin, a decision we distinguished in the prior majority opinion. *See* Valley Broad., 107 F.3d at 1334-36.

We remain persuaded, for the reasons stated in our previous opinion, that Rubin does not compel the striking down of § 1304. The government may legitimately distinguish among certain kinds of gambling for advertising purposes, determining that the social impact of activities such as state-run lotteries, Indian and charitable gambling include social benefits as well as costs and that these other activities often have dramatically different geographic scope. That the broadcast advertising ban in § 1304 directly advances the government's policies must be evident from the casinos' vigorous pursuit of litigation to overturn it. *See* Posadas, 478 U.S. at 342, 116 S. Ct. at 2977 ("[T]he fact that

---

[8]  *See supra* note 5.

appellant has chosen to litigate this case all the way to this Court indicates that appellant shares the legislature's view.") (citing Central Hudson, 447 U.S. at 569, 100 S. Ct. at 2353). There is also no doubt that the prohibition on broadcast advertising reinforces the policy of states, such as Texas, which do not permit casino gambling. Further, as previously noted, the Supreme Court rejected in Edge the contention that permitting other forms of media to advertise certain types of gambling undercuts the government's policy interests. See Edge, 509 U.S. at 433-34, 113 S. Ct. at 2707; accord Central Hudson, 447 U.S. at 569, 100 S. Ct. at 2353; Dunagin v. City of Oxford, 718 F.2d 738, 747-51 (5th Cir. 1983) (en banc); see also Anheuser-Busch, Inc. v. Schmoke, 63 F.3d 1305, 1313-14 (4th Cir. 1995), opinion on remand from Supreme Court, 101 F.3d 325 (4th Cir. 1996). We would be acting more out of a hunch that we were wrong on Rubin than compulsion based on 44 Liquormart if we were now to revise our third prong Central Hudson analysis.

After 44 Liquormart, however, the fourth-prong "reasonable fit" inquiry under Central Hudson has become a tougher standard for the state to satisfy. Little deference can be accorded to the state's legislative determination that a commercial speech restriction is no more onerous than necessary to serve the government's interests. Posadas has been discredited to this

extent.

The government still contends, however, that a ban on broadcast advertising for casino gambling is no more extensive than necessary to serve its interests in reducing public participation in commercial gambling and in back-stopping the policies of anti-gambling states. While not limiting its argument to the full scope of social ills historically associated with gambling,[9] the government's remand brief focuses on the broadcast advertising restriction as an effective means to counteract compulsive gambling. Unfortunately, the government's assertions concerning compulsive gambling, intuitively sensible though some of them are,[10]

_____

[9] The social problems encompass rises in organized crime, violence, embezzlement, fraud, see, e.g., Valley Broad., 107 F.3d at 1332, petty theft, employment problems, bankruptcy, depression, suicide, and family troubles, including debt burdens, financial and emotional neglect, abandonment, and divorce, see National Gambling Impact and Policy Commission Act: Hearings on H.R. 497 Before the Comm. on the Judiciary, 104th Cong. (Sept. 29, 1995) [hereinafter 1995 Hearings] (statement of Senator Richard G. Lugar), available in 1995 WL 572923; id. (statement of Congressman Frank R. Wolf), available in 1995 WL 572926; id. (statement of Paul Ashe, President of National Council on Problem Gambling), available in 1995 WL 572924; Blaine Harden & Anne Swardson, Addiction: Are States Preying on the Vulnerable?, Wash. Post, March 4, 1996, at A1; see also Posadas, 478 U.S. at 341, 106 S. Ct. at 2976-77 ("'[e]xcessive casino gambling among local residents . . . would produce serious harmful effects on the health, safety and welfare of the Puerto Rican citizens, such as the disruption of moral and cultural patterns . . . .'").

[10] See Appellees' Supplemental Brief at 11. Affecting senior citizens, see, e.g., Dan Herbeck, Gambling Stakes Can Be High for Senior Citizens, Buff. News, Feb. 8, 1998, at A1, adults, and children alike, see, e.g. Art Levine, Playing the Adolescent Odds, U.S. News & World Rep., June 18, 1990, at 51, compulsive gambling

11

has been described by the American Psychiatric Association as a "'disorder of impulse control,'" Ruth Benedict, Council Prepares to Treat Compulsive Gamblers, Crain's Det. Bus., Jan. 13, 1997, at 10; see also Harden & Swardson, supra note 9 (noting that Harvard Psychology Professor Howard Shaffer has found that gambling alters the chemistry of the brain and affects the central nervous system much like a drug). Although compulsive gamblers represent a small percentage of the gambling community, they are responsible for a disproportionate share of industry revenue. See Harden & Swardson, supra note 9 (conservative estimate that compulsive gamblers contribute twenty-five percent of casino revenue). Moreover, a recent study by Harvard Medical School concluded that the number of compulsive gamblers living in the United States and Canada is rising, having grown by 1.6 million adults in the last two decades. See Derrick DePledge, Betting the next Roll Wins Study: Gamblers' Odds of Addiction Rising, Fla. Times Union, Dec. 23, 1997, at C1. The study estimated total number of compulsive gamblers at 3.8 million. See id.

Experts attribute these rising numbers to the growing acceptance of gambling within America's entertainment culture, where casinos advertise as family resorts filled with the glamour and allure of easy millions. See id. (quoting Professor Shaffer). Short of prohibiting gambling altogether, limiting broadcast messages about casino gambling may indeed be one of the most effective methods of limiting a compulsive gambler's exposure to a lifestyle that can be as irresistible as it is socially destructive. See, e.g., William Safire, A Gambling Lesson: There's Now a Sucker Born Every Second, Dallas Morning News, June 6, 1998, at 11A ("[M]any psychiatrists suggest[] that a significant number of gamblers . . . were encouraged in their addiction by the lure of casino advertising."); see Harden & Swardson, supra note 9 (noting that the increased availability of gambling is fueling the addiction).

Compulsive gamblers often suffer from financial hardship, emotional difficulties, including alcoholism, depression, stress-related diseases, and suicide attempts. See also Harden & Swardson, supra note 9; Problem Gamblers, Rolling the Dice with their Lives, Buff. News, June 25, 1996, at C1. Moreover, experts estimate that the trouble of each compulsive gambler affects the lives of ten to seventeen people. See, e.g., Gordon Johnson, Everybody Loses, Press-Enterprise, Jan. 25, 1998, at D1. Very often, the gambler's loved ones must endure emotional turmoil, financial neglect, abuse, and divorce. Studies also suggest that children of compulsive gamblers perform worse academically, are more likely to become alcoholics, develop gambling problems

12

raise numerous fact issues at a belated stage of this litigation. The government's new argument suffers fatally, however, because none of its sources specifically connect casino gambling and compulsive gambling with broadcast advertising for casinos. If the government's burden were to establish a direct, quantitative evidentiary link among these phenomena, we do not believe it has done so. But 44 Liquormart, though more demanding on the fourth prong of Central Hudson, does not appear to establish an insurmountable test.

The federal government's policy toward legalized gambling is consciously ambivalent. What began as a prohibition on all interstate lottery advertising has been successively, but gingerly modified to respect varying state policies and the federal government's encouragement of Indian commercial gambling. The remaining advertising limits reflect congressional recognition that gambling has historically been considered a vice; that it may be an

---

themselves, develop eating disorders, experience periods of depression, and attempt suicide. See Appellees Supplemental Brief at 13-14 (citing Douglas A. Abbot et al., Pathological Gambling and the Family: Practice Implications, 76 Fam. Soc. 213, 216-17 (1995); Mark Dickerson, Gambling: A Dependence without a Drug, 1 Int'l Rev. Psych. 157, 162 (1989); Durand F. Jacobs et al., Children of Problem Gamblers, 5 J. Gambling Behav. 261 (1989)). One observer concluded that in some respects, the harm a compulsive gambler inflicts upon his children and his family is really much greater than an alcoholic or drug addict. See Harden & Swardson, supra note 9.

addictive activity;[11] that the consequences of compulsive gambling addiction affect children, the family, and society;[12] and that organized crime is often involved in legalized gambling.[13]

In both Edge and Posadas, federal and territorial governmental decisions to discourage certain types of gambling, while couched in ambivalence similar to that contained in § 1304, were nevertheless regarded as justifiable. Moreover, in Edge, the restriction on broadcasting by a non-lottery-state station was upheld despite the fact that over ninety percent of the station's listeners lived in a state where the lottery is legal. The Court was persuaded that controlling access to broadcast lottery advertising by thousands of local North Carolina households furthered North Carolina's anti-lottery policy. See Edge, 509 U.S. at 428-30, 113 S.Ct. at 2704-05.

A direct inference from Edge would therefore be that if

---

[11] See, e.g., 1995 Hearings, supra note 9 (statement of Paul Ashe, President of National Council on Problem Gambling) (noting that the American Medical Association recognized pathological gambling as an addiction in 1994); see also Harden & Swardson, supra note 9 ("Gambling researchers and psychotherapists agree that the increased availability of legal gambling is fueling increased addiction.").

[12] See, e.g., Brett Pulley, Those Seductive Snake Eyes: Tales of Growing Up Gambling, N.Y. Times, June 16, 1998, at A1 (discussing the social problems stemming from the proliferation of youth gambling); Harden & Swardson, supra note 9.

[13] See, e.g., Valley Broad., 107 F.3d at 1332 (discussing hearings before President's Commission on organized crime).

the federal government may pursue a cautious policy toward the promotion of commercial gambling, then it may use one means at its disposal -- a restriction on broadcast advertising[14] -- to control demand for the activity. Further, it may do so even though the restriction will "deprive" the casinos of their opportunity to reach potential customers by one method of advertising in states where they legally operate.

44 Liquormart does not undercut this reasoning. The blanket ban on price advertising there was viewed as too great an imposition on speech because it was (a) comprehensive and (b) an indirect, imperfect tool for manipulating prices compared with alternative direct policies such as minimum prices or taxation.

By these tests, § 1304 cannot be considered broader than necessary to control participation in casino gambling. First, there is no blanket ban on advertising. The ban is more analogous to a time, place and manner restriction. Other media remain available, such as newspapers, magazines and billboards, and indeed broadcast advertising of casinos, without reference to gambling, is permitted. Section 1304 simply targets the powerful sensory appeal of gambling conveyed by television and radio, which are also the most intrusive advertising media, and the most readily available to children. Second, regulation of promotional advertising directly

---

[14] It is postulated that advertising stimulates demand.

influences consumer demand, as compared with the indirect market effect criticized in 44 Liquormart. Moreover, the efficacy of non-advertising-related means of discouraging casino gambling is purely hypothetical, as such measures would have to compete with the message of social approbation that would simultaneously be conveyed by unbridled broadcast advertising. Section 1304, in short, is tailored to fit the statutory purpose of controlling demand and does not unduly burden speech.

The government also defends the nationwide prohibition of this advertising as necessary to enforce the policies of non-casino-gambling states like Texas. The broadcasters view this restriction as overbroad and assert that only an Edge-like compromise, whereby broadcasters in pro-gambling states could advertise their casinos while non-gambling-state broadcasters could not do so, is constitutionally mandated by the narrow tailoring test. Perhaps the Supreme Court will see it this way; or perhaps the Supreme Court will overrule Edge as inconsistent with its cases in the ensuing five years. But 44 Liquormart does not provide any basis for reaching such results, and the broadcasters have identified no non-speech-related alternatives to § 1304 as a means of assisting anti-gambling states. If § 1304 can be upheld on the basis of protecting the non-gambling states, then it is reasonable for the broadcast ban to be nationwide in effect. As Edge stated, and we earlier noted,

16

> In response to the appearance of state-sponsored lotteries, Congress might have continued to ban all radio or television lottery advertisements, even by stations in States that have legalized lotteries.

509 U.S. at 428, 113 S. Ct. at 2704. Central Hudson, as applied after 44 Liquormart, does not inhibit all legislative flexibility in confronting challenging social developments.

Moreover, if this remand opinion is wrong, and § 1304 is invalidated, there will be no federal protection for non-casino-gambling states, and their citizens will be subject to the influence of broadcast advertising for privately owned casinos. This is not a neutral position; it is one that effectively awards federal sanction to an activity that is again coming to be viewed with moral and utilitarian suspicion.[15] Historically, state and local government policies toward legalized gambling have oscillated between prohibition and regulated legalization, as the social problems gambling stimulates have risen and fallen. What is needed is legislative flexibility, so that the people's representatives can respond to the varying consequences of legalized gambling. If court decisions decree unbridled advertising of "truthful, non-misleading speech" however, the legislature's flexibility will be impaired. In the case of gambling, the consequences may be stark: whatever is legal may be advertised; only a prohibition of gambling will justify a ban on advertising. More disturbing, whatever

---

[15] See supra notes 9-13.

gambling is legal anywhere may be advertised everywhere. No local prohibition of gambling will be meaningful, and communities will be less capable of insulating themselves and their children from the deleterious influence of gambling. Doctrinal rigidity in this type of case would seem to be the enemy of federalism, of flexible representative government, and of peoples' right to make choices to protect their community and their children. <u>Central Hudson</u>, as applied after <u>44 Liquormart</u>, does not totally foreclose such flexibility.

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

ENDRECORD

POLITZ, Chief Judge, dissenting:


Having concluded previously that the federal ban on broadcast advertisement of casino gambling fails to satisfy the requirements of **Central Hudson**,[16] the stricter standard employed by the Supreme Court in **44 Liquormart**[17] only strengthens my convictions. Thus, for the reasons assigned in my prior dissent, I must continue to dissent.[18]

The failure of the Justices to reach an agreement in **44 Liquormart** about the specifics of the parameters of the constitutional review to be applied to commercial speech restrictions deprives the lower courts of the

---

[16] **Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York**, 447 U.S. 557 (1980).

[17] **44 Liquormart, Inc. v. Rhode Island**, 517 U.S. 484 (1996).

[18] **Greater New Orleans Broadcasting Ass'n, Inc. v. United States**, 69 F.3d 1296, 1303 (5th Cir. 1995) (Politz, C.J., dissenting).

guidance a coherent, dispositive framework would have provided for evaluating these claims. The divergent analyses unnecessarily blur the boundaries of commercial speech.

A close reading of **44 Liquormart** discloses, however, that a majority of the Court felt strongly that truthful commercial speech about lawful services should enjoy greater first amendment protections than that previously afforded. It appears manifest that the Court will no longer defer to "legislative judgment," grant "broad discretion" for "paternalistic purposes," accept the "greater-includes-the-lesser" reasoning, or defer to the "vice" exception.[19] Read together, the opinions in **44 Liquormart** teach that the government must use direct methods of controlling disfavored behavior. This, combined with the heavy burden of proof that is now placed on the government, substantially undercuts the validity of laws, such as the statute at issue here, which restrict nondeceptive commercial information.

---

[19] **44 Liquormart**, 517 U.S. 484.

If not so viewed previously, it must now be recognized that the statutory advertising proscription at bar herein simply fails to advance directly the government's asserted interests and, accordingly, must be deemed overbroad under the heightened standards of **44 Liquormart**. The numerous exceptions and inconsistencies contained in the publication ban abundantly undermine and are adverse to the asserted government interests, precluding the material advancement thereof.[20] In addition, given the many exceptions, the government has totally failed to meet its burden of proving that a nationwide ban is mandated.

I respectfully dissent.

---

[20] **Greater New Orleans Broadcasting Ass'n**, 69 F.3d at 1304. See also **Valley Broadcasting Co. v. United States**, 107 F.3d 1328 (9th Cir. 1997), cert. denied, 118 S.Ct. 1050 (1998) (finding the same ban at issue here to violate the first amendment after **44 Liquormart** because of the numerous exceptions).