James R. LINDSEY and Sun Cha
Lindsey, and their marital
community, Plaintiffs,

v.

TACOMA–PIERCE COUNTY HEALTH
DEPARTMENT, a combined City–Coun-
ty Health Department; et al., Defen-
dants.

No. C97–5076 RJB.

United States District Court,
W.D. Washington.

March 16, 1998.

Bradley S. Keller, Byrnes & Keller, Seattle, WA, for plaintiffs.

Clifford D. Allo, Tacoma–Pierce County Health Dept., Tacoma, WA, for defendants.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

BRYAN, District Judge.

This matter comes before the court on Defendants' Motion for Summary Judgment (Dkt.# 70); and Plaintiffs' Motion for Partial Summary Judgment Re First Amendment Claim (Dkt.# 73). The court has considered the pleadings filed in support of and in opposition to the motion, the oral arguments of counsel held on Friday, February 27, 1998, and the file herein.

## I.

### SUMMARY JUDGMENT STANDARD

The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir.1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., the preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, 106 S.Ct. 2505; *T.W. Elec. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Service*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

## II.

### FACTUAL AND PROCEDURAL BACKGROUND

The plaintiffs are the owners of convenience stores located in Pierce County, Washington. They hold valid cigarette retailers' licences issued by the State of Washington. Before March 1, 1997, they dis-

played cigarette advertising on the outside and the inside of their stores. The plaintiffs received financial compensation tied to the volume of cigarette sales, display of advertisements, and the participation in promotional programs.

The defendants comprise the Tacoma–Pierce County Health Department, its Board of Health, individual board members, the City of Tacoma and individual city and county officials (hereinafter referred to collectively as "the Board of Health"). The Board of Health is empowered by law to enact and enforce local rules and regulations "to preserve, promote, and improve the public health" of the City of Tacoma and greater Pierce County. RCW 70.05.060, 60(3).

Incidental to those duties, the defendants held two hearings regarding the rising incidence of cigarette smoking by children since the initiation of the so-called "Joe Camel" advertising campaign. In response to those hearings, on December 4, 1996, the Board of Health enacted the "Truth in Outdoor Tobacco Advertising Regulation" (hereinafter referred to as "TOTAR."), Resolution No. 96–1997, effective March 1, 1997. TOTAR. is attached to this order as Appendix A. In two and one half pages of factual findings, the Board of Health determined that tobacco use has significant health consequences in the State of Washington and in Pierce County (Appendix A, ¶¶ 2.1–2.1.2.5); that infants suffer health consequences (¶¶ 2.1.3–2.1.3.4); that tobacco advertising induces children to use tobacco products (¶¶ 2.2–2.2.1.7); that the State of Washington has laws forbidding the sale of tobacco to minors (¶¶ 2.33, 2.3.1); that tobacco advertising in outdoor, public spaces can stimulate the use of tobacco products among minors (¶¶ 2.5.1–2.5.3); and that interests of protecting minors from tobacco use and parents who wish to shield their children from exposure to tobacco products outweighs the legitimate interests of adults who wish to purchase tobacco products (¶¶ 2.4; 2.6; 2.7). As a result of these findings, the defendants enacted restrictions against outdoor advertising of tobacco products within view of a school, playground, public park, or street (¶¶ 3.1–3.3).

The plaintiffs filed this lawsuit attacking the validity and the constitutionality of TOTAR. In a previous order, the court held that TOTAR was within the legislative authority of the Board of Health, and that TOTAR was not preempted by federal or state law. See Order Granting Defendants' Motion for Partial Summary Judgement; Denying Plaintiffs' Motion for Summary Judgment, entered November 6, 1997. Dkt. # 48. That order dismissed the plaintiffs' first, fourth and fifth causes of action of the plaintiffs' amended complaint. *Id.* The parties filed cross motions for summary judgment on whether TOTAR violates the plaintiffs' First Amendment right to commercial speech, as set forth in the plaintiffs' second and third causes of action.[1]

III.

## OVERVIEW OF APPLICABLE LAW

In pertinent part, the First Amendment states: "Congress shall make no law … abridging the freedom of speech …" Commercial speech, expression which is related solely to the economic interests of the speaker and its audience, is afforded a measure of First Amendment protection from unwarranted governmental regulation because of its informational function. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 761–62, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

The seminal case on the restriction of commercial expression is *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). There, an electric utility challenged the constitutionality of the New York Public Service Commission's ("Commission") regulation which completely banned promotional advertising by the utility. The Commission instituted the advertising ban because it determined that promotional advertising of utility services was contrary to the national policy of conserving energy. 447 U.S. at 559–560, 100 S.Ct. 2343. The Supreme Court held that the regulation violated the First

---

1. The plaintiffs' third cause of action lists three separate claims for violations of their civil rights pursuant to 42 U.S.C. § 1983: 1) First Amend-

ment, at issue here; 2) the Federal Act (15 U.S.C. § 1331); and 3) the Fifth Amendment.

Amendment because the link between the Commission's purpose and the advertising ban was too tenuous and speculative to support the ban, and because the complete advertising ban was more extensive than necessary to fulfill its purpose. *Id.* at 570–71, 100 S.Ct. 2343. The court recognized that commercial speech is accorded a lesser degree of protection than other types of constitutionally protected expression, and that the First Amendment's concern for commercial speech is based on the informational function of advertising. *Id.* at 563. In order to legally restrict commercial speech, the state must assert a substantial interest to be achieved by the restriction in proportion to that interest, and the restriction must be carefully designed to achieve the State's goal. *Id.* at 564. The court set forth a four-part analysis for challenged restrictions on commercial speech:

> First we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Second, we ask whether the asserted governmental interest is substantial. Third, if both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and fourth, whether it is not more extensive than is necessary to serve that interest.

Id. at 566.

Since *Central Hudson,* the Supreme Court has had several opportunities to apply its four-part test. In *Posadas de Puerto Rico Associates v. Tourism Co.,* 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986), the court upheld legislation which prohibited the advertisement of casino gambling aimed at residents of Puerto Rico. The government wanted to reduce the demand for gambling among its residents because of the harmful effects of excessive gambling, such as the disruption of cultural patterns, increase of local crimes of prostitution, stealing, and corruption, as well as increases in organized crime. The court found that these government goals were substantial and were served by the restrictions. *Id.* at 341, 106 S.Ct. 2968.

In *Board of Trustees of the State Univ. of N.Y v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), the court modified the "not more extensive than necessary" portion of the fourth prong to require a "reasonable fit" between the legislative purpose and the chosen means to achieve the purpose.

The Supreme Court addressed a federal law that prohibited beer brewers from stating the alcohol content on the labels of their beverages in *Rubin v. Coors Brewing Co.,* 514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995). Brewers were allowed to do so in advertising and on the labels of distilled spirits, but not on the labels of beer. *Id.* at 479–80, 115 S.Ct. 1585. The government's purpose was to prevent "strength wars" by brewers who compete for customers based on the alcohol content of their beers, and to assist states' efforts to regulate alcohol. *Id.* at 483–84. After applying the third and fourth part of the *Central Hudson* test, the court held that the government's interest in preserving state authority was not sufficiently demonstrated to meet the requirements of *Central Hudson. Id.* at 486, 115 S.Ct. 1585. The court also held that several alternatives were available to the government to achieve its goals in a less intrusive manner than the inconsistent restriction in the federal law. *Id.* at 491.

Most recently, in *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), the court struck down Rhode Island's statutes which prohibited advertising alcoholic retail prices anywhere except at the point of purchase. While all nine justices concurred in the judgment, no rationale was able to garner a majority. Justices Stevens, Kennedy and Ginsburg stated that the court must determine if the "price advertising ban will *significantly* reduce alcohol consumption." 116 S.Ct. at 1509 (emphasis in original). Justice Stevens stated that Rhode Island could not rely on "speculation and conjecture" to advance its goals. 116 S.Ct. at 1510. Justice O'Connor stated that the state is required to show that the restriction "directly advances its interests and is narrowly tailored." 116 S.Ct. at 1522.

In the Ninth Circuit, two cases are relevant. In *Valley Broadcasting Co. v. U.S.,* 107 F.3d 1328 (9th Cir.1997), broadcasters

brought an action for declaratory and injunctive relief claiming that federal ban on broadcast advertisements of casino gambling violated the First Amendment. The government asserted two interests; reducing public participation in commercial lotteries, and protecting those states that choose not to permit casino gambling within their borders. *Id.* at 1331. The court found that the federal ban on broadcast advertisements of casino gambling violated the First Amendment because the federal statute was contradictory and inconsistent like the law at issue in the *Coors Brewing* decision. *Id.* at 1335–36. The court concluded that the government had presented no specific evidence to support its claim that modern day lotteries are vehicles of social ills. *Id.* at 1335. The Ninth Circuit also held that

> Ultimately, what is required is a fit between the restriction and the government interest that is not necessarily perfect, but reasonable. However, the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose. Rather, the government must demonstrate that its restrictions will in fact alleviate [the asserted harms] to a material degree.

*Id.* at 1334 (citations and internal quotations omitted).

In *Nordyke v. Santa Clara County*, 110 F.3d 707 (9th Cir.1997), the Ninth Circuit considered the addendum to a lease of a county fairground which banned gun shows on the fairground's property. *Id.* at 708. The purpose of the prohibition was "to avoid sending the wrong message to the community relative to support of gun usage, to improve the Fairgrounds' image, and to reduce the fiscal impact of criminal justice activities in response to gun-related violence." *Id.* at 709 (internal quotations omitted). The court found that the county failed to show that its concerns were real, and that, if those concerns were valid, that having gun shows at the fairgrounds caused or reinforced those concerns. *Id.* at 713. The court also found that non-speech-restrictive alternatives were available, such as a ban on the direct sale of guns on the fairgrounds. *Id.* at 712.

The only published case addressing the restriction of tobacco advertising is *Penn Adv. of Baltimore v. Mayor and City Council,* 63 F.3d 1318 (4th Cir.1995), *vacated and remanded,* 518 U.S. 1030, 116 S.Ct. 2575, 135 L.Ed.2d 1090 (1996), *modified by* 101 F.3d 332 (4th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1569, 137 L.Ed.2d 715 (1997). The Fourth Circuit easily upheld Baltimore's ordinance prohibiting outdoor advertising of tobacco products in a visibly public location. 63 F.3d at 1326. Its purpose was to prevent minors from being encouraged to use tobacco products through viewing outdoor advertisements. *Id.* at 1321. Both the ordinance and its purposes are very similar to TOTAR. In *Penn Advertising,* the court adopted its reasoning in the companion case dealing with Baltimore's restriction on publicly visible advertising of alcoholic beverages in an attempt to curtail underage drinking. *Id.* at 1325 (relying on *Anheuser–Busch, Inc. v. Schmoke,* 63 F.3d 1305 (4th Cir.1995)).

In both cases, the Fourth Circuit focused on the third and fourth prongs of the *Central Hudson* test. As to the third prong, the court held that it was not necessary for the city to conclusively prove the correlation between the restriction and the purpose or to prove that the restriction will solve the problem. "If that were required, communities could never initiate even minor steps to address their problems, for they could never be assured of the success of their efforts." 63 F.3d at 1324 (quoting *Anheuser–Busch,* 63 F.3d at 1314). As to the fourth prong, the court held

> If there were less restrictive means of screening outdoor advertising from minors, or of reducing the area of billboard regulation in a manner that would have it focus more efficiently on reaching minors, the City would have to consider those alternatives. But it is not an acceptable response to the approach taken by the City of limiting advertising exposure to say that the City must abandon altogether an approach that directly advances its goal. In the face of a problem as significant as that which the City seeks to address, the City must be given some reasonable latitude.

*Id.* at 1325–26 (quoting *Anheuser–Busch,* 63 F.3d at 1316).

## IV.

### ISSUES

The issues presented in the motions pertain to the third and fourth prongs of the *Central Hudson* test. The parties agree that the first and second prongs are not disputed.[2] The issues are whether there are material issues of fact on:

A. Whether TOTAR satisfies the third prong of the *Central Hudson* test, that is

1. Does TOTAR directly and materially advance its purpose of reducing minor tobacco use?

2. Are the advertising restrictions in TOTAR sufficiently related to its purpose?

B. Whether TOTAR satisfies the fourth prong of the *Central Hudson* test, that is, are non-speech-restrictive alternatives available to achieve the purpose of TOTAR?

## V.

### DISCUSSION

A. *Whether TOTAR satisfies the third prong of the Central Hudson test* —

1. *Does TOTAR directly and materially advance its purpose of reducing minor tobacco use.*

■ The plaintiff argues that TOTAR carves out exceptions to the ban on outdoor advertisements for outdoor stadiums, tribally owned lands, and military bases. As a result of these exceptions, the plaintiffs contend that TOTAR fatally undermines its effectiveness, and the defendants cannot show that it directly and materially advances its purpose.

In response, the defendants contend that TOTAR does not contain exceptions or loopholes. The defendants present evidence that advertisement of tobacco products is not permitted at the outdoor entertainment facilities in Pierce County. The defendants also present evidence that outdoor advertisement of tobacco products is not permitted on the military bases, and the defendants contend that they presently lack jurisdiction to regulate advertisements on tribally owned lands.

The plaintiffs rely heavily on *Valley Broadcasting, supra,* to support their argument because the law at issue in that case allowed advertisements for certain types of gambling but prohibited it for commercial lotteries.

[W]e are troubled by the numerous exceptions to section 1304. Although criminalizing broadcast advertising by commercial lotteries, the regulatory scheme at issue here permits the following lotteries to advertise via the airwaves: state-run lotteries, fishing contests, not-for-profit lotteries, lotteries conducted as promotional activities by commercial organizations, and, perhaps most significantly, any gaming conducted by Indian Tribes pursuant to the Indian Gaming Regulatory Act.

107 F.3d at 1334 (citations omitted). There, not surprisingly, the government could not present evidence to support its purpose of reducing the social evils of gambling by picking and choosing which lotteries could use broadcast advertisements and which lotteries could not. Similarly, in *Coors Brewing,* the government could not support its decision to allow manufacturers to post the alcohol content on the labels of some types of alcoholic beverages but not on beer. 514 U.S. at 488–89, 115 S.Ct. 1585.

On careful reading of TOTAR, no similar exceptions to those in *Valley Broadcasting* or *Coors Brewing* are found. For example, there are no exceptions for certain types of tobacco products, such as smokeless tobacco or cigars. TOTAR does distinguish between outdoor advertisements seen from the street and within 1,000 feet of areas used by minors from advertisements inside of stores and in other types of media. See Appendix A, ¶¶ 3.1.3, 3.2.3, and 3.3. The defendants target the type of advertisement of tobacco products within their control and in places most likely to be seen by minors. As held in *Penn Advertising,* there is a logical nexus between the defendants' purpose and the means it has chosen to carry out its purpose. 63 F.3d at 1325 (relying on *Anheuser–Busch,*

---

**2.** The first prong, whether the expression concerns lawful activity, may be in issue at a later time. The Washington Legislature has passed a bill making minor possession or attempts to obtains, tobacco products a class 3 civil infraction, and clarifying penalties for violation of current laws regarding youth access to tobacco. H.B. 1746, as amended by the Senate, passed 55th Leg. Sess. (Wash. Mar. 9, 1998).

63 F.3d at 1314 (finding that "outdoor advertising is a unique and distinct medium which subjects the public to involuntary and unavoidable solicitation, and that children, simply by walking to school or playing in their neighborhood, are exposed daily to this advertising."). For these reasons, TOTAR is distinguishable from the rules in *Valley Broadcasting* and *Coors Brewing*. No issues of fact exist for trial on whether TOTAR satisfies the third *Central Hudson* prong. Based on this discussion, and the discussions of the following issues, TOTAR directly and materially advances the purposes intended by the defendants.

The defendants' motion for summary judgment on this issue should be granted, and the plaintiff's motion for summary judgment on this issue should be denied.

### B. Whether TOTAR satisfies the third prong of the Central Hudson test —

#### 2. Are the advertising restrictions in TOTAR sufficiently related to its purpose.

■ The plaintiffs argue that the defendants do not present evidence to prove that restricting outdoor advertising of tobacco products will stop the use of those products by minors. The plaintiffs present evidence that advertising has no effect on minors' decision to use tobacco products. See Affidavit of Michelle Al. Wolf, Ph.D., Dkt. # 84. The plaintiffs also argue that minors see advertising in many other media and that there is no showing that TOTAR's restriction will have any effect. The plaintiffs urge the court to make its own independent evaluation of the research underlying the defendants' stated purposes at trial, and contend that the court will conclude that TOTAR has no supportable basis.

The defendants respond that they have relied on research and precedent to make the detailed factual findings in TOTAR. See Appendix A, ¶¶ 2.1–2.7. The defendants argue that tobacco advertising contributes to an environment that increases the susceptibility of vulnerable minors, and that the defendants' choice to restrict outdoor advertising hits the areas with the greatest impact on children. Finally, the defendants argue that the law does not require a perfect fit between the goal and the means chosen; only a reasonable fit.

■ The plaintiffs' argument that the defendants come to court without any factual support for TOTAR is erroneous. TOTAR contains two and one half pages of findings and the defendants present additional, publicly available evidence to support their premise that advertising impacts minors' use of tobacco products. See Declaration of Clifford Allo, Ex. 2 to Defendants' Response Brief, Dkt. # 80. The only evidence the plaintiffs present to contradict the defendants' findings are a compilation of studies that show that advertising has no effect on minors' decision to use tobacco products. But TOTAR addresses more than a minor's initial decision to use tobacco products; it targets the continued exposure and temptation through the advertising of the availability of tobacco products to minors in areas where minors travel, play, and attend school. Further, the defendants do not have to prove that the chosen means is most likely to achieve complete success in the stated goal, but only that the means is reasonably related to the goal. Whether the court evaluates the defendants' chosen means to effect its stated goals from the standpoint of judicial notice (*Central Hudson*, 447 U.S. at 567, 100 S.Ct. 2343), "reference to studies and anecdotes, ... [or] based solely on history, consensus, and 'simple common sense'" (*Anheuser–Busch*, 63 F.3d at 1312 (citations omitted)), or "accumulated, common-sense judgment" (*Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 508, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981)), the result is the same—a reasonable fit exists. *Accord Penn Advertising*, 63 F.3d at 1325.

■ By now, it is well established that advertising increases sales, *Central Hudson*, 447 U.S. at 569, 100 S.Ct. 2343 ("There is an immediate connection between advertising and demand for electricity."); *Posadas*, 478 U.S. at 342–43, 106 S.Ct. 2968 (finding that the legislature's belief that advertising increases demand for the product advertised is reasonable and legitimate.). As the defendants point out, the First Amendment protection of commercial speech does not intend to protect an increase of sales but the con-

sumer's interest in obtaining information about available products. *44 Liquormart,* 517 U.S. at 495–96, 116 S.Ct. at 1504–05, 134 L.Ed.2d at 723–24 ("Advertising, however tasteless and excessive it sometimes may seem, is nonetheless dissemination of information as to who is producing and selling what product, for what reason, and at what price.") (quoting *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 765, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)). *See also Bates v. State Bar of Arizona,* 433 U.S. 350, 364, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). Here, the defendants seek to restrict the flow of information about the availability of tobacco products to minors in public areas where minors are most likely to see the advertisements. Minors have no need, and should have no interest, in obtaining information about the availability of tobacco products on their way to school or to the playground.

Another critical feature of TOTAR is that it is not a complete ban on advertising. It bans outdoor advertising 1,000 feet around schools, parks and playgrounds, and where the advertising can be seen from the street. Left intact is the ability to advertise inside stores and facilities where tobacco products can be purchased, and in any other media not controlled by the defendants. *44 Liquormart,* 517 U.S. at 500–02, 116 S.Ct. at 1507–08, 134 L.Ed.2d at 726–27 ("complete bans unlike content-neutral restrictions on the time, place, or manner of expression, are particularly dangerous because they all but foreclosure alternative means of disseminating certain information.") (citations omitted); *Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343 (observing that the court has never approved a complete ban on commercial speech); *Nordyke,* 110 F.3d at 713 (striking down a complete ban on gun shows at a county fairground).

For these reasons and the reasons argued by the defendants, no issues of fact exist for trial on this issue. TOTAR satisfies the third *Central Hudson* prong to the extent that the advertising restrictions are sufficiently related to its purposes. The plaintiffs' motion for summary judgment on this issue should be denied, and the defendants' motion for summary judgment on this issue should be granted.

### C. Whether TOTAR satisfies the fourth prong of the Central Hudson test—Are non-speech-restrictive alternatives available to achieve the purpose of TOTAR?

The plaintiffs argue that the defendants have failed to explore numerous other alternative means to curb tobacco use by minors. For example, the plaintiffs contend that the defendants should ensure stricter enforcement of existing laws against the sale of tobacco products to minors, conduct anti-tobacco campaigns in schools, and enact ordinances forbidding the possession and use of tobacco by minors. Because of the defendants' failure to consider and implement these alternatives, the plaintiffs argue that the defendants cannot satisfy the fourth prong of the *Central Hudson* test.

The defendants respond by citing the various programs aimed at discouraging the use of tobacco products by minors already in existence. The defendants deny that they have the legal obligation to exhaust all other conceivable alternatives before imposing a restriction on advertising. The defendants also argue that TOTAR is a less restrictive limitation than a complete ban on advertising.

The plaintiffs' reliance on *Nordyke, supra,* is misplaced. There, the court held that not only did the county adequately support the validity of its concerns about gun usage, the county failed to present any connection between its ban on gun shows at the fairgrounds and its concerns. 110 F.3d at 712. Here, TOTAR contains the defendants' factual findings regarding the immediate and long-term health risks to minors who use tobacco products. The defendants also presented evidence that other means of educating minors about the health risks of the use of tobacco products are in place. One goal of TOTAR is to bolster the existing programs by removing visible enticement of readily available tobacco products in public areas most frequently used by minors. Despite the plaintiffs' efforts, they have not presented authority that requires the defendants to exhaust all other conceivable means of achieving their goals before imposing an advertising restriction. Nor have plaintiffs shown that the defendants must conclusively prove that their chosen means will effectively

stop the use of tobacco products by minors in Pierce County. The defendants' objectives and the means chosen fall within the range allowed by the First Amendment. *Penn Advertising,* 63 F.3d at 1326.

For these reasons and the reasons argued by the defendants, no issues of fact remain for trial on this issue. TOTAR satisfies the fourth prong of the *Central Hudson* test to the extent that no other less restrictive means are readily available to achieve the purposes of TOTAR. The plaintiffs' motion for summary judgment on this issue should be denied, and the defendants' motion for summary judgment on this issue should be granted.

## VI.

### CONCLUSION

The court concludes that TOTAR does not violate the plaintiffs' First Amendment right to commercial expression. TOTAR satisfies the third and fourth prongs of the *Central Hudson* test. The plaintiffs' motion for summary judgment should be denied, and the defendants' motion for summary judgment should be granted. The plaintiffs' claims of violations of their First Amendment rights should be dismissed, and the plaintiffs' sec-ond and third claims as to the First Amendment challenges should be dismissed. Counsel should advise the court before the date of the pretrial conference, in writing, if there re issues remaining for trial, or if the case should be dismissed.

Therefore, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt.# 70) is **GRANTED.** The plaintiffs' claims that TOTAR violates the First Amendment are **DISMISSED.** It is further

**ORDERED** that Plaintiffs' Motion for Partial Summary Judgment Re First Amendment Claim (Dkt.# 73) is **DENIED.** It is further

**ORDERED** that the Plaintiffs' Second and Third Causes of Action are **DISMISSED** as to the First Amendment claims. It is further

**ORDERED** that the parties shall advise the court before the pretrial conference, in writing, if there are issues remaining for trial, or if a Judgment of Dismissal should be entered.

The Clerk of the Court is instructed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

## APPENDIX A
### RESOLUTION NO. 96-1997

**BE IT RESOLVED THAT THE TACOMA-PIERCE COUNTY BOARD OF HEALTH,** does hereby establish a policy to reduce the marketing of tobacco products to children within Pierce County, as specified within.

1   **Authority**

1.1   The Revised Code of Washington, RCW 70.05.060 (Powers and duties of local board of health) commands, among other things, "Each local board of health shall have supervision over all matters pertaining to the preservation of the life and health of the people within its jurisdiction and shall: Enact such local rules and regulations as are necessary in order to preserve, promote and improve the public health and provide for the enforcement thereof."

1.2   The Tacoma-Pierce County Health Department Board of Health was established under the authority of RCW 70.08 by the City of Tacoma and the County of Pierce, Washington to fulfill the duties set by RCW 70.05.060 and other provisions.

1.3   This Regulation shall be known as and may be cited as the "Truth in Outdoor Tobacco Advertising" Regulation.

2   **Findings**

2.1   The Tacoma-Pierce County Health Department Board of Health finds that the use of tobacco has prevalent, material, and predictable deleterious impacts on the health of individuals and is therefore a significant threat to the public health in Pierce County.

2.1.1   Users of Tobacco suffer significant health consequences.

2.1.1.1   Eight thousand people die every year in Washington State from illnesses attributable to tobacco. More people die from tobacco use than from auto accidents, suicide, alcohol, AIDS, drugs, homicides, and fires combined.

2.1.1.2   Lung cancer is the state's leading cause of cancer among both men and women. Cigarette smoking causes more than 81% of Washington's lung cancer deaths.

2.1.1.3   Smoking-related illnesses caused 1.3 million disability days among Washington workers in 1988.

2.1.2   Persons exposed to second hand smoke suffer significant health consequences.

Revised: December 4, 1996          G:\LIBSHARE\OPCOFDIR\ALLO.WPD          Printed: December 10, 1996

-XIIP

2.1.2.1      Every year diseases caused by exposure to tobacco smoke, a class-A carcinogen, kill more than 50,000 non-smoking Americans. Passive exposure to cigarette smoke is the third leading cause of preventable death in America. Only active smoking and alcohol abuse rank higher.

2.1.2.2      According to the Environmental Protection Agency, second-hand smoke causes 3,800 lung cancer deaths each year.

2.1.2.3      Nonsmokers that live with smokers have a 10- to 30-percent greater risk of death from heart disease than nonsmokers that do not live with smokers.

2.1.2.4      Second-hand smoke causes 150,000 to 300,000 lower respiratory infections each year in infants each year.

2.1.2.5      Infants exposed to cigarette smoke have face an increased risk of Sudden Infant Death Syndrome.

2.1.3    Infants exposed to *in utero* suffer significant health consequences.

2.1.3.1      Infants born to mothers who smoke have reduced lung function for years.

2.1.3.2      Children of mothers who smoke are more likely to have oral clefts, where the upper lip or roof of the mouth do not close properly, than children of nonsmokers.

2.1.3.3      Smoking may cause up to 7.5 percent of all miscarriages in America.

2.1.3.4      Each year, 26,000 infants are admitted to intensive care because of low birth weights caused by maternal smoking.

2.2    Tobacco advertising, whether intended to promote tobacco use or only to compete for market share, has the consequence of promoting tobacco use.

2.2.1    Tobacco advertising induces children to initiate tobacco use.

2.2.1.1      Countries that have banned or restricted tobacco promotion have enjoyed greater decreases in the prevalance of young people that smoke than more permissive countries.

2.2.1.2      Teens are three times more sensitive to tobacco advertising than adults. A 20-year comparison of cigarette brand sales and advertising campaigns found that youth are three times more likely than adults to buy the most heavily advertised brands of cigarettes.

2.2.1.3      RJR initiated the *Old Joe Camel* campaign in 1988. In the next three years, the Camel brand's share among underage smokers rose from 0.5% to 32.8%, and underage purchasers became one-quarter of Camel's market. Since the introduction of the *Old Joe Camel* campaign, teen smoking has increased ten percent.

2.2.1.4      An aggressive marketing campaign aimed at young people to promote smokeless tobacco has stimulated use among children dramatically. The average age for new users is 10 years.

2.2.1.5      Camel's market share among children is twice what it is among adults.

2.2.1.6      Although tobacco advertising does not appear on television and six year olds are not significant consumers of magazines, enough exposure to the Old Joe Camel campaign has occurred in their environment to give that artwork recognition by six year old children equal to Mickey Mouse, Chevrolet, and Ford, all of whom do appear on TV.

2.2.1.7      Exposure to tobacco marketing, parental smoking, and peer smoking are the greatest risk factors for teens that decide to smoke. Of these, exposure to marketing is the greatest risk.

2.3      RCW 26.28.080 provides that selling or giving tobacco to a minor is a gross misdemeanor.

2.3.1      RCW 26.28.080's prohibition on sales, as a supply-side measure, is useful but insufficient alone to prevent tobacco use by minors.

2.3.2      Additional, demand-side measures are necessary to reduce the harm tobacco use causes in Pierce County.

2.4      Adults who wish to purchase tobacco products have legitimate interests in information that provides price and availability—hours, locations, and brands—but have no fundamental need for art or other inducements that do not provide truthful information about tobacco products or about the market for tobacco products.

2.4.1      Tombstone advertising is sufficient to provide the truthful information, such as price and availability, that adults may desire to make an informed choice in the marketplace among retailers and brands.

2.4.2      Logos, artwork, and opinions do not provide information about price and availability and cannot be truthful information because they are not falsifiable.

2.5      Outdoor advertising on billboards or otherwise outside premises where tobacco products may lawfully be sold to consenting adults intrude into public spaces.

2.5.1      When such messages intrude into public spaces, parents lose the ability to restrict the inducements to tobacco initiation and use to which their children are exposed.

2.5.2      When such messages intrude into public spaces, current minor users receive cues that can stimulate cravings that lead to avoidable use and deeper addiction.

2.5.3      When such messages intrude into public spaces, minors who are former, recovering users of tobacco receive cues that can stimulate lapses in their recoveries and contribute to readdiction.

2.6 The interest of adults in market information with which to make lawful purchases may, under the Constitution, outweigh the interests of parents, nonusers, users who seek to reduce use, and recovering users, but is not immune from reasonable time, place, and manner restrictions.

2.7 The interest of adults, who use tobacco, in messages beyond those needed to make lawful purchases—color messages, images, logos, and other artwork and nonfalsifiable statements—does not outweigh the interests of parents who wish to protect their children, minors who prefer not to begin tobacco use, minors who wish to end their unlawful use of tobacco, and minors who wish to preserve their status of being in recovery from addiction to tobacco.

## 3 Limitations

3.1 Except as stated below, outdoor advertising of tobacco and tobacco products is prohibited within the jurisdiction of the Tacoma-Pierce County Health Department Board of Health.

3.1.1 For the purposes of this prohibition, "outdoor advertising" means advertising that can be seen from the street.

3.1.2 Advertising in sports stadiums or other enclosed outdoor spaces is not within this ban if it cannot be seen from outside the enclosure.

3.1.3 Advertising within buildings or other enclosures shall be considered outdoor advertising if it can be seen from outside the building or enclosure through windows, doors, or other apertures or if it can be seen on television.

3.2 Except as provided below, licensed retailers of tobacco and tobacco products may post price and availability information outside their premises in tombstone formats.

3.2.1 For the purposes of this prohibition, a tombstone format means a format in which truthful, factual information appears in clear, plain black type on a white field without adornment and unaccompanied by color, opinion, artwork, or logos.

3.2.2 No tombstone advertising shall be visible from a school, school bus stop, bus stop, or sidewalk regularly used by minors to get to school.

3.2.3 No tombstone advertising shall be placed within one thousand (1,000) feet of a school, playground, or public park.

3.3 Advertising that is within premises licensed to sell tobacco and tobacco products but not visible from the street may be in any format and present any information or images not otherwise prohibited by law.

4       Enforcement

4.1     Monitoring

4.1.1   Owners of outdoor advertising facilities shall provide the Health Officer notice of tobacco advertisements no less than five (5) days after agreeing to display the advertisement.

4.1.1.1     The notice to the Health Officer shall include the location(s) of the advertisement, a reasonable facsimile of the advertisement, the first date of display, and the last date of display.

4.1.1.2     Each renewal of an advertisement or each change in the content of the advertisement shall require a separate notice to the Health Officer.

4.1.2   The Health Officer shall monitor outdoor advertising, as defined in this regulation, within the jurisdiction of the Tacoma-Pierce County Health Department Board of Health.

4.2     If the Health Officer determines that a tobacco advertisement violates this regulation, the Health Officer shall so notify the owner of the outdoor advertising facility of the determination, cite with specificity the violation(s) the Health Officer has found, and order the owner to remove the advertisement.

4.3     If the owner of the outdoor advertising facility does not dispute the Health Officer's determination and order, then the owner shall remove or correct the violation within two (2) weeks of receipt of the Health Officer's notice.

4.4     Appeals.

4.4.1   If the owner of the outdoor advertising facility chooses to dispute the Health Officer's determination, then the owner shall so notify the Health Officer within two (2) weeks of receipt of the Health Officer's notice. The Health Officer shall transmit the owner's notice of dispute to the Health Department's Hearing Examiner for prompt review of the Health Officer's determination. The owner may maintain the advertisement until the Hearing Examiner orders otherwise.

4.4.2   The owner may appeal an order of the Hearing Examiner by writ of certiorari in the Superior Court for Pierce County. The owner's petition for a writ of certiorari shall not stay the Hearing Examiner's order.

4.4.3   If the Hearing Examiner does not sustain the Health Officer's determination, then the Health Officer may seek review in the Superior Court for Pierce County by petition for a writ of certiorari. The Health Officer's petition shall not stay the Hearing Examiner's Decision.

4.5 Under this Regulation, an order by the Health Officer becomes final if the owner fails to file a timely appeal at any stage or upon the final decision of a court with jurisdiction over the controversy.

4.6 Penalties

4.6.1 If the owner does not remove or correct the violation within two (2) weeks after the Health Officer's determination and order become final, then the Health Officer shall assess a fine of one hundred dollars ($100.00) per day for each advertisement in violation of the Health Officer's determination and order. The Health Officer may also seek injunctive relief to enforce his order.

.4.6.2 If the owner of an outdoor advertising facility fails to provide the Health Officer the notices required by this regulation, then the Health Officer shall assess a fine of twenty dollars ($20.00) for each day the notice is delayed.

5 The Effective date for this regulation shall be March 1, 1997.

6 If the final decision of a court with jurisdiction finds any portion of this regulation in violation of either the United States Constitution or the Constitution of the State of Washington, the balance of the regulation shall remain in effect.

**TACOMA-PIERCE COUNTY BOARD OF HEALTH**

_____
**Chair, Board of Health**

**December 4, 1996**
_____
**Date of Adoption**

Revised: December 4, 1996          G:\LIBSHARE\OFCOFDIR\ALLO.WPD          Printed: December 5, 1996